## No. 12,940.

WIDOW AND HEIRS OF PAUL KOERBER VS. THE NEW ORLEANS LEVEE BOARD, ET ALS.

51 523
s52 2110

### SYLLABUS.

1. Where plaintiff sues for a certain amount for injury done to his property by defendant, and the latter has, after an answer filed by them, pleading the general issue, restored the property to its original condition, he is entitled to set up that fact by supplemental answer. The issues in a case of that character are not changed by such answer.

The whole tendency of later jurisprudence is towards extending the privilege of amendment as far as is consistent with substantial justice and not in: opposition to express statutes.

Multiplicity of suits and creation of oppressive costs are thus avoided.

.2.  Ordinarily private property should be taken for public use only by regular judicial proceedings, but there are occasions when the public safety requires and justifies the taking by the State of such property under the exercise of its police powers.  It is the duty of the State to save the owner thoroughly harmless under such circumstances.

.3.  The Board of Levee Commissioners of the Orleans Levee Board is a "body politic" with corporate powers, with the right granted to it to sue and be sued.  It was created as a governmental public agency to represent the State in dealing with the matters and things placed under its control by the statutes referring to it.

The object of the Board was to protect the property within the district from overflow as rapidly and effectually as possible by the construction and repair of all levees, whether on river, lake, canal or elsewhere, necessary for that purpose.

To that end it was granted the franchise and power to do and perform all things needful to carry out the purposes of the act and vested with discretionary power of action in cases of emergency.

.4.  The right and power of the Board to act in emergency cases was not made by law conditional upon having obtained prior thereto the approval and consent of the State Board of Engineers.

The provisions of the law relating to such approval bear not upon the exercise of the power of ordering emergency work, but upon the method by which the contract for the work should be made.  The validity of the contract might be affected by departure from the terms of the law in this regard, and yet the work itself might have been legally ordered and executed.

:5.  It was not necessary to warrant action by the Board as being taken under an emergency that it should wait until there was an actual break in the levee or it was in face of an absolute certainty that there would be such a break.

To require this would make the exercise of the power practically useless.

'6.  When the work ordered by the Board to be made is authorized to be made in the exercise of the police power of the State, the contractor for the work is authorized to enter upon the owner's property to execute the same and the latter is not justified in resisting his doing so.  When such resistence is made he is authorized to put an end to the same, provided he do so in a legal manner not passing beyond the exigencies of the case.  He is authorized to invoke the aid and assistance of a policeman present in arresting the parties, instead of attempting to enforce legal rights himself, as thereby there would be less danger of a breach of the peace.

ON APPEAL from the Civil District Court for the Parish of Orleans.  *Ellis, J.*

*G. V. Soniat* and *C. W. Besancon* for Plaintiffs, Appellants.

*Bernard McCloskey* for Defendants, Appellees.

Argued and submitted February 23, 1899.
Opinion handed down March 7, 1899.

The opinion of the court was delivered by

NICHOLLS, C. J.   Plaintiffs, the widow and heirs of Paul Koerber,. in a petition filed on May 12th, 1897, asked judgment *in solido* against the city of New Orleans, the Orleans Levee Board, Alonzo C. Bell, Otto Thoman and William G. Mitchell, for thirty-five hundred dollars.

Otto Thoman, one of the defendants, was at the time of the acts· referred to in plaintiff's petition, president of the Orleans Levee· Board, Alonzo C. Bell, city engineer, and William G. Mitchell, a contractor, under a contract with the Orleans Levee Board, for the purpose of repairing and strengthening the protection levee, a levee situated in the parish of Orleans between the parishes of Orleans and Jefferson.

Among the plaintiffs were John Koerber and Paul Koerber, sons of Paul Koerber, Sr.

Their demand is based upon allegations that the Orleans Levee· Board was then in the act of repairing the so-called upper protection levee, situated in New Orleans, between the boundaries of the parishes of Orleans and Jefferson.   That said Levee Board had given out the contract for said repairing to one William G. Mitchell, who had hired a number of persons to do said works for said Levee Board.   That for the purpose of raising and strengthening said Protection Levee under his contract it became necessary for said contractor to obtain dirt; that a vast amount of same was obtained from the streets of the· Seventh Municipal District, at a great distance from said works and at great cost to the contractor and the Levee Board, and to the great cost of the raising of said levees, and Alonzo C. Bell, city engineer,. seeing the defacing of the public streets and the great cost that would ensue to the city for replacing the streets in the same condition as· they were originally, after conferring with the authorities of the Orleans Levee Board, came to the conclusion that the taking and appropriating for said purpose of petitioner's property was the easiest way out of the difficulty, so that on Saturday, the 24th day of April, 1897, at about 4 p. m. on a day and at an hour when petitioners could not have protected their legal rights by way of injunction or otherwise, said parties having confederated as aforesaid, invaded with about one hundred men and trespassed upon, without any warrant in law, certain property in the city of New Orleans belonging to them which they fully described.   That two of the plaintiffs, John Koerber

and Paul Koerber, some time after the invasion of petitioner's lands, seeing that great damage was being done their property came upon same and in order to protect petitioner's rights, protested against the illegal taking of their land and the digging of large trenches for the purpose of taking dirt; that Alonzo C. Bell, acting in his individual capacity and by authority of the Orleans Levee Board and as City Engineer, or in all of said capacities, did threaten to arrest both of protestants, and actually did cause the arrest of Paul Koerber without any warrant in law—that neither the Orleans Levee Board, nor the city of New Orleans, nor said contractor, had any right or authority to invade and trespass upon said lands in order to make the excavations on same; that no authority was ever shown petitioners or any of them, that could have granted to said trespassers the right to take physical possession of the same. That expropriation proceedings were never instituted against petitioners for said lands, and petitioners further averred, that no written permission of the State Board of Engineers was ever obtained by the Orleans Levee Board, authorizing them to employ any contractor, or any one else for any so-called emergency work as required by law; that no actual emergency existed at the time to warrant the illegal appropriation of petitioner's lands as aforesaid.

They further represented that said contractor, William G. Mitchell, and Otto Thoman, authorized and assisted by the Orleans Levee Board, did employ between eighty (80) and one hundred men (100) in making said excavations and removing dirt from petitioners' lands. That petitioners' property was at the time of filing their petition, a pond throughout its length and breadth for more than three feet (3 feet) deep and water was then standing, and it was then unfit for habitation or occupation. That their property was, prior to the excavation, very valuable, due to the fact that a line of street railway had then its tracks laid and would soon have run its cars to their property, which was situated at its *terminus* at the head of Fourth street. That the destruction of their property had caused great damage and injury to same, to an amount exceeding two thousand dollars, which they considered a very fair and reasonable amount of actual damages; that the annoyance and humiliation caused them by the forcible entry upon their property and the trespassing upon same, the taking of same and spoliation of same, without any warrant in law, exceeded the sum of fifteen hundred dollars ($1500.00), which petitioners considered a

very fair and reasonable amount of punitive and exemplary damages done in the premises.

The Levee Board answered, pleading first, the general issue. It then averred that the Board of Commissioners of the Orleans Levee Board, under Act No. 93 of 1890, was authorized and empowered to appropriate property for levee purposes, and it was under the authority to it delegated in said act, authorized and empowered to take the quantity of dirt referred to in the petition of plaintiffs. That the property referred to in the plaintiffs' petition was part of the levee system of the parish of Orleans, and respondent was not liable to pay for any property taken as aforesaid for levee purposes, or destroyed for such purposes. That the dirt referred to in plaintiffs' petition, was absolutely necessary for levee purposes, and respondent, even if expropriation proceedings would have been necessary under ordinary circumstances, were justified in the emergency wherein said dirt was taken to use and employ the same for levee purposes. That the Board of Commissioners of the Orleans Levee District considered the protection levee of the city of New Orleans required strengthening, and in furtherance of said views, required the said dirt. That, if the court should find that the respondent should pay for the dirt thus used, as aforesaid, then the amount due could only be determined by a jury, empanelled in accordance with the expropriation laws, and the value of the same could not be determined in any other way.

The Orleans Levee Board (over plaintiffs' objections, and under their bill of exception) was permitted by the court to file a supplemental answer in which it averred that at the date of the filing of the original answer, the Mississippi River was at a high stage, and threatening the city of New Orleans. That said answer was filed under conditions then existing in the city of New Orleans. That since the filing of said original answer, defendant had replaced the dirt or earth referred to in the petition filed, and therefore, no cause of action existed.

The District Court rendered judgment in favor of the defendant, and plaintiffs appealed. During the trial plaintiffs discontinued their demand against Bell, Thoman, Mitchell and the city of New Orleans.

#### OPINION.

The Orleans Levee District was created by Act No. 93 of 1890,

entitled: "An act to establish the Orleans Levee District and Board of Levee Commissioners thereof, to define their powers and duties, to provide a revenue therefor and to repeal conflicting laws."

By the sixth section of the Act, the Board was charged with the construction and repairing, and invested with the control and maintenance of all levees in said Orleans District, whether on river, lake, canal, or elsewhere, and directed to proceed as rapidly and effectually as possible to put the same in such state as to amply protect the property within the district by the best methods.

The Board, as to location, construction and repairs of all levees necessary to protect said district, were to first have the approval in writing, of the State Board of Engineers.

All levee work or work of similar character, except that required by emergency, was directed to be advertised, to be let out by sealed proposal, to the lowest responsible bidder, reserving to the said Board authority to reject all bids.

The act declared that in case of emergencies, said Board might, itself, build or repair levees to protect said District, without such competition, but with the approval, as aforesaid, of the State Board of Engineers if it should be practicable to obtain such approval, in such cases however spreading on its minutes a statement of the reasons of such action.

By the third section, the Board of Commissioners of the District, authorized by the act to be appointed by the Governor, was created "a body politic," and had conferred upon it "the franchise and power to do and perform all the purposes of the act, and to act, hold, own and convey all the property, real and personal, needful in the premises, and to alienate, mortgage and pledge the same for said purposes."

By the eighth section, the Board was given full power to expropriate any lands necessary for its works, whether in the parish of Orleans, or in adjoining parishes, by the proceedings provided by the Civil Code of 1870, Articles 2626 to 2641, inclusive, which were thereby made, in all respects, applicable to said Commission, and its works and the right of way over all lands of the State and of the city of New Orleans were thereby granted to said Commissioners for any of its works.

By the ninth section, it was enacted that the act should be liberally construed to effect its object.

Section six of Act 93 of 1890, was amended and re-enacted by Act

FIFTY-FIRST ANNUAL REPORTS, 1899.                529

Heirs of Koerber vs. N. O. Levee Board et als.

No. 79 of 1892.  The amending act charged the Board of Commis-sioners with the control and maintenance of all levees in said Orleans District, whether on river, lake, canal, or elsewhere.  It made it also the duty of said Board to provide by the best method, for the thorough protection of said district against overflow, and to this end said Board should have full power and authority to put up and erect, in connec-tion with its levee system, such pumps, flood gates and other appliances as might become necessary to carry out said purpose, provided that the said Board of Levee Commissioners, as to location, construc-tion and repairs of all levees on the river front of said district should first have the approval, in writing, of the State Board of Engineers.

All levee work and other work ordered by the Board, except that required by emergency work, was directed to be advertised to be let out, by sealed proposals, to the lowest responsible bidder, reserving to said Board to reject any and all bids.  In cases of emergency, said Board was authorized to itself build or repair levees, and do all other neces-sary work to protect said district without such competition, "but with the approval, as aforesaid, of the State Board of Engineers, in such cases, however, spreading on its minutes a statement of the reasons for such actions."

In 1897 the waters of the Mississippi river rose to such an unusual height as to cause the gravest apprehension of disaster throughout all that portion of the State subject to overflow.

The members of the State Levee Board, with a view of averting as best they could the threatened danger, left the city of New Orleans, the domicile of the State Board, to take personal supervision of the levees within the different districts to which they had been assigned, making it impossible to secure, at that time, Board action in reference to levee matters, within the city of New Orleans.

The people of that city and the members of the Orleans Board shared in the fears entertained on this subject throughout the country parishes; immense interests were at stake and official responsibility very heavy.

Danger confronted the city, not only from the levees directly upon its river front, but from the waters which would flow into it from the sides and rear, from breaks in the levees in the parish of Jefferson, which parish adjoined on its lower line the upper line of the parish of Orleans.

Called to take action, the Orleans Levee Board determined to meet
34

the latter danger by raising and broadening a levee known as the protection levee, which had been constructed a number of years before. That levee ran almost at right angles from the Mississippi River along the boundary lines between the two parishes just named, back to the swamp.

To accomplish the object in view it was necessary that earth should be taken from the properties lying along and near the base of this levee to be thrown upon the levee.

The plaintiffs in this suit owned land just in that situation. Property so situated was not held subject to a servitude for the erection of levees running back from the river.

Regularly, it could only be taken for such purpose for public use by means of judicial expropriation, proceeding upon proper compensation made according to law. It was, however, liable to be so utilized, under the exercise of the police power of the State, when called into action by emergency admitting of no delays.

Defendant Board, considering the situation to be one of emergency, made a contract with W. G. Mitchell, one of the defendants, to repair and strengthen the protection levee, without having first advertised the same for sale at public auction.

The work was ordered and executed and the contract given to Mitchell, without prior consultation with or consent of the State Board of Engineers.

On April 24th, 1897, before commencing work upon the levee, the Orleans Levee Board, through its secretary, wrote a letter to John Koerber, in which they said that the requirements of the Board would compel them to take dirt from his lot, corner of Oak and Protection streets, but that they would refill it when the water receded, and that the letter sent him would be the basis and evidence of his claim when the river went down.

Mitchell, with a view of executing his contract, proceeded with his laborers to the protection levee, and entered upon the property of the plaintiffs, but before work to any extent had been made, two of the plaintiffs, John and Paul Koerber, appeared to protest, as they claimed, against an illegal invasion of and unwarranted taking of their property, evidently under the impression that a judicial expropriation was essentially necessary to have been made to justify the action of the Board.

A number of persons, from curiosity or otherwise, appeared upon

FIFTY-FIRST ANNUAL REPORTS, 1899.        531

Heirs of Koerber vs. N. O. Levee Board et als.

.the scene and quite a heated discussion took place as to what should
.or should not be done, and one or more of the bystanders made use of
intemperate remarks.  Paul Koerber forbidding the workmen to pro-
ceed in their work, it became evident that it would stop unless his op-
position could be disposed of at once.  To that end Bell, one of the
defendants, who was present as the consulting engineer of the defend-
ant Board, ordered a policeman, who was on the spot, to arrest Paul
Koerber and take him to the office of one of the city recorders, Bell
saying that he would make a charge against him.

The order was obeyed and the three proceeded before the recorder.
Before his office was reached, Koerber asked to be permitted to see cer-
.tain parties, with a view of getting released on bail, but Bell informed
him that he would see that he was paroled, and this promise was
carried out.

The prosecution was abandoned and Koerber discharged the next
day, or a few days after.

In the meantime, the work was carried on ,and in the course of
several weeks the widening and raising of the levee was completed.

In the course of this work, the property of the plaintiff seems to
have been pretty effectually dug up, as some of the witnesses said "con-
.verted for the time being, into a pond."  After the waters receded so
:as to admit of sand being taken from the banks, the defendant Board
.caused the lot to be filled up (completely so, according to the defend-
ants' contention, and very imperfectly and insufficiently so, according
to that of the plaintiffs).  For several years prior to the execution of
this work by the Orleans Levee Board, Protection or Upper Line
street, a street running back from the Mississippi river, and which
formed the upper boundary of plaintiffs' property, had been partially
taken up by the building on its upper side, of Protection Levee, but
there remained still some open space between the base of the levee
and plaintiffs' upper side line, by means of which they could have
access, (though not as fully as would be proper and customary) from
the street in front to that in the rear.  This open space included that
usually devoted in cities to the sidewalks.

The raising and widening of Protection Levee by the defendant
Board caused this space to be closed up to, if not beyond, plaintiffs'
line; Protection Levee itself being now the upper boundary of plain-
tiffs' lot.  The record does not show who was the owner of the pro-
;perty covered originally by Protection street and the sidewalks of the

same, at the time of the dedication of the same as a street, and we do not know where the ree of the same was at the time the open space we have referred to was closed.

Almost immediately after the work was commenced under Mitchell's contract, and while plaintiffs' property was in its worst condition, the present suit was brought; brought obviously under a sense of having been outrageously treated, both as respects personal and property rights. It was only subsequently to the filing of the suit and the answer of the defendant Board that the lot was refilled by orders of the defendant Board.

The first contention made by the parties was that on the part of the defendants, that there was a misjoinder of parties plaintiffs and an improper joinder of different causes of action between distinct parties.

They contend that Paul Koerber has improperly cumulated an action for malicious prosecution, in which he is alone concerned, with an action for damages, brought by other parties.

Defendant is mistaken in supposing that the allegations made in plaintiffs' petition were advanced for the purpose of basing thereon a substantive cause of action. They were inserted in the petition merely for the purpose of swelling the amount of damages claimed by the plaintiffs in an action for malicious, forcible trespass, by showing, as they claimed, aggravating circumstances connected with defendant's taking illegal possession of their property. On plaintiffs' theory of their case, there was no misjoinder.

The next question we have to consider, is whether plaintiffs' complaint that defendant should not have been permitted by the court to file the supplemental answer found in the record, is well founded. They maintain that it was too late for them to file an answer, and besides, it changed the issue before the court. They contend that after the defendant took possession illegally of their property, they had the right to sue upon a money demand for damages, and defendant could not cut off this claim for money and substitute in lieu of that remedy to which they were legally entitled by *a restitutio in integrum;* that it was optional with them to say whether their property should be replaced in its original condition or not, and they had elected not to have this done.

That defendant's answer was substantially a plea of payment or compensation, which they were not authorized to make.

In ruling that defendant's supplemental answer should be filed, the

court informed plaintiffs that time would be granted to them if they so desired. They did not avail themselves of the privilege.

Plaintiffs' action is not basd upon the theory that their property has been taken from them by means of expropriation or otherwise, but that the property (still theirs) had been maliciously trespassed upon and injured, for which injury they ask for damages in the amount claimed.

They have not abandoned the property nor tendered it to the defendant, but the owners thereof, sue the Board for damages after it (without opposition from them) has refilled the lot.

When the plaintiffs demanded from them two thousand dollars as damages to their property, and the defendants pleaded the general denial, we think that defendants were authorized, under that plea to show either that they owed them nothing at all, or an amount less than the sum claimed. The substantial issue at the time of the judgment was whether, by the action of the defendant, plaintiffs could rightfully ask judgment for two thousand dollars, as having received injury to that extent. If their property at the time of the judgment was in as good condition as it had ever been, it would be inequitable to permit them to ignore that fact by reason of the circumstance that at some particular antecedent date, it had been damaged to some extent.

Mere replacement of the property to its original position would, however, leave open any claims which plaintiffs might properly have for the *tort dehors* that resulting from the depreciation of the property itself. The action, under certain circumstances, would not abate even by an admission by the plaintiffs that the property had been restored to its original condition, though the question of the damages claimed upon that branch of the case might be eliminated. (Powers vs. Florance, 7th Ann. 524). "The violation of the right to the use of property supports an action to vindicate the right without proving damages." (Dudley vs. Tilton, 14th Ann. 283).

The fact that the injury to the property was repaired after the defendant had filed its answer did not do away with its right to plead it by supplemental answer and prove the fact on the trial.

It is true that decisions can be found announcing the doctrine that facts occurring after the institution of suit cannot be considered to determine the justice of the demand.

(Hennen's Digest, Title Judgment, subdivisions "Of the Conditions

of Judgment; and its Conformity to the Pleadings and Verdict," pages 783, 784); but this rule is subject to many exceptions and each case has to be determined on its own state of facts.

We are of the opinion that the District Judge did not abuse his discretion in permitting the filing of the supplemental answer, particularly in view of the fact that he offered to grant plaintiffs time should they desire it.

The whole tendency of later jurisprudence is towards extending the privilege of amendment as far as is consistent with substantial justice and is not in opposition to express statute. Multiplicity of suits and creation of oppressive costs upon litigants are thereby avoided.

We are not called on to express any opinion as to what the legal situation would have been had we decided that the defendant had illegally and maliciously trespassed upon plaintiffs' land and invaded their rights of property, and that Bell, in so doing, had illegally caused the arrest of Paul Koerber.

The conclusion we have reached on those subjects and the discontinuance of plaintiffs' demand, as to Bell individually, eliminate that question from the case. (See on this subject, Sicard vs. Chitz, 13 La. Rep. 111).

The Board of Levee Commissioners of the Orleans Levee District is "a body politic," with corporate powers, with the right granted to it to sue and be sued.

It was designedly created as a governmental public agency, to represent the State in dealing with the matters and things placed under its control by the statutes referring to it.

The object of the Board was to protect the property within the district from overflow as rapidly and effectually as possible, by the construction and repair of all levees, whether on river, lake, canal or elsewhere, necessary for that purpose. To that end the Board was granted "the franchise and power to do and perform all the purposes of the act."

Act No. 93 of 1890, by which the Board was created, was partially amended and re-enacted by Act No. 79 of 1892.

In the original act the Board were directed as to the location, construction and repairs of all levees, to first have the approval, in writing, of the State Board of Engineers.

In the amending act it was provided that the Board of Commissioners should first have such approval as to all levees on the river

front; such prior approval not being called for in respect to levees elsewhere.

In both acts it was made the duty of the Board of Commissioners generally to advertise and let out by sealed proposals to the lowest responsible bidder, all levee work, or work of similar character.

The Legislature, foreseeing the possibility of some emergency occurring which might call for immediate action in order to secure the public safety, gave to the Board the power to meet such emergency. In aid of the exercise of that power the General Assembly dispensed it from letting out the work in the manner provided for and authorized it to give out the work by private contract.

In the original act this right was to be exercised with the approval of the Board of Engineers, if it should be practicable to obtain such approval—in such cases it was made the duty of the Board to spread on its minutes a statement of the reasons of such action.

In the amending act, the words "if it be practicable to obtain such approval," were omitted.

The plaintiffs contend that the work done by the Board of Commissioners upon the Protection Levee was not "emergency" work, and their property could only have been taken for public use through and under regular expropriation proceedings and prior compensation. But that, even if the work was called for by an emergency, the Board did not have the prior consent thereto of the State Board of Engineers, and by law this prior consent was made a condition precedent to the work being done.

They maintain that the action of the Board in the premises was premature; that they were not confronted by an actual, but a mere possible danger, and therefore they acted beyond their powers. We do not think the Board was called upon to wait until they were in face of an actual danger. To postpone action until there was an actual break in the levees of Jefferson parish, or until there was an absolute certainty that they would break and that therefrom the parish of Orleans would be inundated, would be to make the exercise of the power of action practically useless.

The work itself of throwing up and strengthening levees is a work of time and the efficiency of the work is also to a very considerable extent, dependent upon time.

We think the situation in the Orleans Levee District at the time

the Board of Commissioners had the work done upon the Protection Levee, was such as to warrant and justify the course followed by it.

Ordinarily, private property should be taken for public use only by regular judicial expropriation proceedings, but there are occasions when the public safety requires and justifies the taking immediately of such property under the police powers of the State.

The plaintiffs were obviously not aware of the fact and were prepared to resist what they deemed an illegal invasion of their property rights.

Persons taking the law into their own hands assume the risk of the consequences of their acts should they be mistaken as to what the law is.

If the Board of Commissioners was authorized to take the action it did (as we hold it was), and the contract with Mitchell was legal, he and his workmen were authorized to enter upon plaintiffs' land, and the latter were not warranted in interfering with them in the discharge of their duty. Bell was, therefore, authorized to put an end to such resistance, provided he did so in a legal manner, not passing beyond the exigencies of the case. We think he was authorized to invoke the aid and authority of the policeman present, instead of attempting to enforce legal rights himself, as there was much less likelihood of a breach of the peace by pursuing such a course.

We do not think that the legality of the work done upon the Protection Levee was dependent upon the Board of Commissioners having obtained prior thereto the approval and consent of the State Board of Engineers. The provisions of the law on that subject bear not upon the exercise of the power of ordering emergency work, but upon the method by which the contract for the work should be made.

The validity of the contract for the work might be affected by departure from the terms of the law in that respect, and yet the work itself might have been legally executed.

Some taxpayer might resist the payment of the contractor on the ground that the contract should have been let out at public auction, but the plaintiffs occupy no such position and raise no such issue in this case.

Coming now to the merits of the case, we are not satisfied that exact justice has been done. Plaintiffs' property has been legally, but somewhat harshly, taken from them, and we think it was the duty of the

Heirs of Koerber vs. N. O. Levee Board et als.

State (and defendants practically represent the State), to have saved plaintiffs thoroughly harmless under the circumstances.

There is great difficulty in reaching that end as the original condition of the lot is not shown with anything like precision so as to make it serve as the basis for a test whether the work of replacement by the defendant Board has been sufficient or not.

There is doubt on that subject and we resolve that doubt in favor of the plaintiffs and we do this the more readily as there is one feature of the case which the Board has evidently overlooked. We refer to the fact that by reason of the work done upon the Protection Levee, the means of passage from the front to the rear of plaintiffs' property on the upper boundary line, has been completely cut off and the value of the lot must have to some extent, been affected by that fact. A "street" has been converted into a "levee," and the character of the original servitude on the upper line radically altered. Whether the fee was in plaintiffs or not, the existence of the street on the upper side was an appurtenance of the property. We are not prepared to say that when plaintiffs were deprived of the benefit of that street by a change of servitude for public use under the police power of the State, they would not be entitled, under the Constitution of 1879, to compensation as for damages to their property. We leave this question open.

The property as we have said, was not held subject to a servitude in favor of the State for levee purposes.

We think the ends of justice will be best subserved by reversing the judgment of the District Court and remanding the case to that court for further proceedings in accordance with law, and in accordance with the views herein expressed.

For the reasons assigned, it is hereby ordered, adjudged and decreed that the judgmnt of the District Court be and the same is hereby annulled, avoided and reversed, and this cause remanded to the District Court for further proceedings, according to law, costs of appeal upon appellee.