496 So.2d 281 (1986)
The BOARD OF COMMISSIONERS OF the ORLEANS LEVEE DISTRICT
v.
The DEPARTMENT OF NATURAL RESOURCES of the State of Louisiana.
Nos. 85-CA-1448, 85-CD-1102 and 85-CD-1107.
Supreme Court of Louisiana.
October 20, 1986.
*284 William J. Guste, Jr., Atty. Gen., Elizabeth Megginson, David C. Kimmel, Asst. Attys. Gen., for D.N.R.
William E. Wright, David P. Banowetz, Jr., Baldwin & Haspel, James Magee, David P. LaNasa, Dale B. Morrison, New Orleans, for defendant-intervenor-appellant.
Sam A. LeBlanc, Franklin Adkins, Adams & Reese, Richard Goins, New Orleans, for Bd. of Commissioners.
Michael R. Fontham, Catherine N. Garvey, Paul L. Zimmering, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, for plaintiff-intervenor-appellee.

ON REHEARING
DENNIS, Justice.
This case calls upon us to decide whether an act of the legislature which declares that the public purpose which originally supported the expropriation of property for a Mississippi River spillway has ceased to exist and orders the return of the property to its former owners should be upheld as a valid act of the plenary power of the people of the state exercised through its legislature or stricken as a violation of one of the specific constitutional provisions that limits the power of the legislature. The district court granted plaintiffs' motion for summary judgment declaring the act unconstitutional and rejected defendants' motion for *285 summary judgment to declare the act constitutional. After a trial, the district court also rendered judgment preliminarily enjoining the enforcement of the act. The defendants appealed from the declaration of unconstitutionality, La. Const. 1974, Art. V, § 5(D) We granted certiorari to review the district court's preliminary injunction and refusal to grant defendants affirmative declaratory relief. 473 So.2d 848 (La.1985).
This court after an original hearing reversed the summary judgment and preliminary injunction and declared that the act of the legislature is constitutional. Board of Commissioners of the Orleans Levee District v. Department of Natural Resources, 483 So.2d 958 (La.1986). Having granted a rehearing, we again decide that the act is constitutional; consequently, the judgments of the district court declaring the act unconstitutional are reversed. The Legislature's plenary power to enact a law providing for the divestiture of a state agency's property is not limited by any of the following constitutional restrictions: the prohibition against the taking of private property except for public purposes and with just compensation, La.Const. 1974, Art. I, § 4; the prohibition against a law impairing the obligation of contracts, Id. Art. I, § 23; the prohibition against the consolidation, division, reorganization or merger of a levee district which impairs the outstanding bonded indebtedness or any other contract of a levee district, Id. Art. VI, § 38(B); or the prohibition against the donation of property of the state or of any political subdivision to any person, association or corporation, Id. Art. VII, § 14(A).
1. Background
By Act 99 of 1924 the Legislature authorized the Orleans Levee Board to acquire land by expropriation, purchase or donation in Plaquemines Parish, and to levy such taxes as may be required, for the purpose of constructing the Bohemia Spillway. Although located in Plaquemines Parish 50 miles down river from Orleans Parish, on the site of what was formerly the Bohemia Plantation, the spillway was designed to assist in protecting the City of New Orleans from flooding by providing a rapid exit for surplus water from the Mississippi River into the Gulf of Mexico, thereby reducing the water level upstream. Of the 33,000 acres required for the creation of the spillway, which was constructed in 1924 to 1926, 3% of the land was acquired by expropriation, 48% by purchase in lieu of expropriation, and 49% by transfer of public lands from the state. The transfer of public lands was accomplished by Acts 246 of 1928 and 311 of 1942, whereby the Legislature conveyed to the Orleans Levee District from the Grand Prairie Levee District all of the state or public land in the spillway.
The owners of private property taken or acquired for the spillway were compensated $389,500, with funds derived from taxes as authorized by the Legislature. The Orleans Levee Board received mineral revenues from the lands in the spillway amounting to $1,734,480 between the years 1929 and 1948 and $42,921,729 between 1950 and 1981. The property within the spillway is currently yielding approximately five million dollars annually in mineral revenues. Approximately 60% of the revenues, or three million dollars annually, is derived from the property which is the subject of this dispute. Board of Commissioners, 483 So.2d at 960, n. 3.
Subsequent to the completion of the Bohemia Spillway other floodway systems were built upriver from the City of New Orleans to provide additional means of diverting water from the Mississippi. In 1983 an amendment to Article VII, § 14(B) of the Louisiana Constitution of 1974 was adopted authorizing the return of property, including mineral rights, to a former owner from whom the property had previously been expropriated, or purchased under threat of expropriation, when the legislature by law declares that the public and necessary purpose which originally supported the expropriation has ceased and orders the return of the property to the former owner under such terms and conditions as specified by the legislature. Pursuant *286 to this authority, by Act 233 of 1984 the legislature declared that the public and necessary purpose for the expropriation of private property for the construction of the Bohemia Spillway had ceased and ordered the return of the property to the former owners or their successors. The act also vested rulemaking authority in the Department of Natural Resources to establish procedures and guidelines for the return of the property and ordered it to evaluate applications submitted by former owners or putative heirs. 483 So.2d 958, 960-61 (La.1986), on original hearing.
The levee district commissioners requested the Department to promulgate rules providing for complete payment to them for any land so returned. Finding in the act neither express nor implied provision for compensation to be paid by claimants to the property, the Department rejected the request. The levee district commissioners brought this suit to have Act 233 of 1984 declared unconstitutional and to enjoin its execution. Howard, Weil, Labouisse & Friedrichs, Inc., holder of bonds issued by the levee district intervened on the side of the commissioners. Owners and successors of owners from whom the property had been acquired intervened as defendants. Both plaintiffs and defendants moved for summary judgment on the issue of whether Act 233 of 1984 is constitutional. The trial court rendered judgments declaring Act 233 of 1984 unconstitutional and enjoining its enforcement.
In its written and oral reasons the trial court held the act unconstitutional because it failed to establish the terms and conditions for the return of land and because it effected a taking of property from the Orleans Levee District by the state other than for public purposes and without just compensation in violation of Art. I, § 4 of the 1974 Louisiana Constitution. In this court, the plaintiffs assert that the Legislature's divestitute of the spillway property is an unconstitutional taking, that the act is unconstitutional because it impairs the obligation of contract between the levee district and its bondholders, and that the act is unconstitutional because it exceeds the 1983 constitutional amendment's authorization by ordering the property returned not only to former owners but also to their successors.
2. The legislature's plenary power is subject to only specific constitutional limitations.
The legislative power of the state is vested in the Legislature. La.Const. 1974, Art. III, § 1. Except as expressly provided by the constitution, no other branch of government, nor any person holding office in one of them, may exercise the legislative power. Id. Art. II, §§ 1 and 2. Furthermore, it is a general principle of judicial interpretation that, unlike the federal constitution, a state constitution's provisions are not grants of power but instead are limitations on the otherwise plenary power of the people of a state exercised through its legislature. In its exercise of the entire legislative power of the state, the Legislature may enact any legislation that the state constitution does not prohibit. Thus, to hold legislation invalid under the constitution, it is necessary to rely on some particular constitutional provision that limits the power of the legislature to enact such a statute. New Orleans Firefighters Association v. Civil Service Commission of City of New Orleans, 422 So.2d 402 (La.1982); State ex rel Guste v. Legislative Budget Committee, 347 So.2d 160 (La.1977); Hainkel v. Henry, 313 So.2d 577 (La.1975); In re Gulf Oxygen Welder's Supply Profit Sharing Plan, 297 So.2d 663 (La.1974). See also, State v. Mallery, 364 So.2d 1283, 1284 (La.1978) ("Except as limited by the constitution its power is plenary"); Swift v. State, 342 So.2d 191, 194 (La.1977) ("Unlike Congress, our State Legislature has all powers of legislation not specifically denied it by the Louisiana Constitution").
Consequently, unless there is a particular constitutional provision which prohibits the Legislature from declaring levee district property no longer publicly useful and ordering the levee commissioners to return it to the owners from which it was taken, the *287 lawmakers may enact legislation transferring the property. Accordingly, in an attempt to justify their claim of unconstitutionality and refusal to obey Act 233 of 1984, the levee district commissioners, joined by the bondholder intervenors, rely on several particular constitutional provisions, each of which they contend prohibits the Legislature from enacting the act in question: private property cannot be taken by the state except for public purposes and with just compensation to the owner, Art. I, § 4; no law impairing the obligation of contracts may be enacted, Art. I, § 23; no action taken to consolidate, divide, reorganize, create, or merge a levee district shall impair the obligation of its outstanding bonded indebtedness, Art. VI, § 38(B); the property of the state or of any political subdivision shall not be donated to any person, Art. VII, § 14(A); nothing in the constitution shall be construed or applied to impair the obligation, validity, or security of any bonds authorized in the 1921 constitution, Art. XIV, § 25.
3. The legislature's divestiture of a state agency's property without compensation is not an unconstitutional taking prohibited by Art. I, § 4 of the constitution.
Article I, § 4 of the 1974 Louisiana Constitution, in pertinent part, provides:
Every person has the right to acquire, own, control, use, enjoy, protect, and dispose of private property. This right is subject to reasonable statutory restrictions and the reasonable exercise of police power.
Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit * * * *
The organization of the constitution, the wording of the declaration of the right to property, the convention proceedings, and prior constitutional provisions and jurisprudence demonstrate that Art. I, § 4 of the 1974 Louisiana Constitution protects individuals from the taking of private property for a non-public purpose or without just compensation. Article I, § 4 does not prohibit the legislature's exercise of its plenary power or the state's police power to divest a state agency of property held for a state purpose.
The organization of the 1974 Constitution indicates that Article I, the Declaration of Rights Article, protects the rights of individuals against unwarrantable government action and does not shield state agencies from law passed by the people's duly elected representatives. See Jenkins, The Declaration of Rights, 21 Loyola Law Rev. 9 (1975) ("[V]irtually all reference to collective rights had been eliminated from the document and a quite different concept of individual rights had been embraced."); Hargrave, The Declaration of Rights of the Louisiana Constitution of 1974, 35 La.L.Rev. 1 (1974); XII Records of the Louisiana Constitutional Convention of 1973: Verbatim Transcripts Aug. 28, 1973, at 46 ("[T]he raison d'entre of government is to protect ... the individual.") [hereinafter cited as Records]; XII Records August 29, 1973 at 38 ("[T]hroughout this Bill of Rights there is one silver lining ... There is a silver thread that runs from the beginning ... to the end. That silver thread is the individual...."). Section 1, which is basically a second preamble, makes clear that the article protects an individual's rights by enumerating them, by providing that the rights of the individual shall be inalienable and by declaring that they shall be preserved inviolate. Every section of the article provides a safeguard for an individual, person, citizen or accused against possible unjust action by a government official. Id. §§ 1-24. The final section underscores the entire article's concern with individual liberty by providing that "[t]he enumeration in this constitution shall not deny or disparage other rights retained by the individual citizens of the state." Id. § 24. Article I was not designed to protect government entities against unjust government action because the delineation of political powers and the protection of local governments from undue legislative interference are treated in the Local Government *288 article. See La.Const. 1974, Art. VI, §§ 4-7.
The clear provisions of Article I, § 4 and the proceedings of the 1973 Constitutional Convention demonstrate conclusively that the delegates intended only to construct a safeguard for private property against state takings without compensation or for non public purposes and did not purport to affect the legislature's ability to manage or dispose of the state's own property through the exercise of its plenary or police powers. Opening the section is a paragraph recognizing every person's right to own and control "private property." Hargrave, supra, at 11. The remainder of the Section limits governmental authority to take or damage private property. Jenkins, supra, at 21. That the adjective "private" is not coupled with "property" throughout the section is not significant because the section was introduced, debated, amended and twice adopted as a single paragraph. Only after adoption of its substance was it divided into three paragraphs by the Committee on Style and Drafting, solely to promote readability. Following its stylistic changes, it was again presented to the convention with no pretext of substantive change, and was finally adopted without further discussion. XII Records, August 30, 1973 at 6-54, 56-120; XV Records, September 13, 1973 at 34-68; XXXVII Records, January 10, 1974 at 3-4. At no point during the debates did the delegates manifest an intent to afford protection under the section to government entities. On the contrary, their sole concern was the relation of the state to the individual and the power of eminent domain over private property. Id.
The due process clauses of previous Louisiana constitutions have expressly provided that private property shall not be taken by the state except for public purposes and with just compensation. La. Const. of 1921, Art. I, § 2; La. Const. of 1913, Art. 167; La. Const. of 1898, Art. 167; La. Const. of 1879, Art. 156. Accordingly, in construing these provisions, our courts have consistently recognized that the safeguard protects the ownership and enjoyment of private property and have never held that the guarantee extends to public property. Dept. of Highways v. Southwestern Electric Power Co., 243 La. 564, 145 So.2d 312 (1962); Scorsune v. State, 224 La. 1031, 71 So.2d 557 (1954); Louisiana Highway Commission v. Davis, 204 La. 624, 16 So.2d 129 (1943); Helmer v. Colo. So. N.O. & P.R. Co., 122 La. 141, 47 So. 443 (1908); State ex rel Cotting v. Somerville, 104 La. 74, 28 So. 977 (1900); Griffin v. Shreveport & A.R. Co., 41 La. Ann. 808, 6 So. 624 (1889). The first sentence of Art. I, § 4 of the 1974 Constitution clearly indicates an intention to continue the safeguard of the right to acquire, own, control, use, enjoy, protect and dispose of private property. The second and third subdivisions are subsidiary implementations of the right to private property stated in the first sentence. Consequently, we conclude that the stylistic subdivision of the long paragraph and the failure to reiterate the adjective "private" in the second and third subdivisions do not indicate an intention by the convention or the electorate to depart abruptly from the well settled principle of our previous constitutions or this court's continuous stream of homogenous judicial decisions. See generally Jenkins, supra, at 19-22; Hargrave, supra, at 11-13.
Moreover, the legislature's divestiture of levee district property does not constitute a taking of property by the state or its political subdivision. Under well settled principles, a levee board is a creature or agency of the state brought into existence for the purpose of discharging the state's duties of flood protection. Accordingly, as between the state and its agency, property is placed under the control of the agency for supervision and administration, the land to all practical intents and purposes being still the property of the state. Richardson & Bass v. Board of Levee Commissioners of Orleans Levee District, 231 La. 299, 318, 350, 353-54, 91 So.2d 353 (1956); Board of Commissioners Caddo Levee District v. Pure Oil Co., 167 La. 801, 120 So. 373 (1929); State v. Standard Oil *289 Co., 164 La. 334, 357, 113 So. 867 (1927); State ex rel. Board of Commissioners of Tensas Basin Levee District v. Grace, 161 La. 1039, 109 So. 830 (1926); Atchafalaya Land Co. v. F.B. Williams Cypress Co., 146 La. 1047, 1061, 84 So. 351 (1920); Koerber v. New Orleans Levee Board, 51 La.Ann. 523, 534, 25 So. 415 (1899); Peart v. Meeker, 45 La.Ann. 421, 425, 12 So. 490 (1893); See Fisher v. Steele, 39 La.Ann. 447, 1 So. 882 (1887). Consequently, under these precepts the legislature's transfer to citizens of lands placed under a levee district's control and administration for flood purposes, constitutes a disposal by the state of its own property rather than a taking of property from a separate person or entity.
The well settled principle that a levee district is a creature or agency of the state was confirmed by the 1974 Louisiana Constitution. The levee districts which previously had been recognized in the jurisprudence as state agencies were continued as organized and constituted. La.Const. 1974, Art. VI, § 38(A). The 1974 Constitution affirmed the legislature's power by law to create, consolidate, divide, or merge levee districts. Id. § 38(A)(1) and (2). However, the numerous detailed provisions of the 1921 Constitution relating generally to levee district board membership, fiscal affairs, taxes and compensation for property and particular sections pertaining to the Orleans levee district board of commissioners and its powers were deleted from the constitution and continued as statutes. La. Const. 1974 Art. XIV, § 16(A)(12); La.Const. 1921, Art. XVI, §§ 1, 4, 6, 7, 8, and 8(A). Thus, the legislature's power to control and regulate a levee district in the performance of its function of providing flood protection was not diminished, but to some extent enhanced, by our most recent constitution.
Additionally, the state's duty to protect citizens from damage by flood is inherent within its police power, which cannot be irrevocably delegated or surrendered except by specific constitutional limitation. The police power is the exercise of the sovereign right of a state to govern persons and things, within constitutional limits, to promote order, safety, health, morals, and the general welfare of society. Francis v. Morial, 455 So.2d 1168, 1172 (La.1984); Fernandez v. Alford, 203 La. 111, 13 So.2d 483, 489 (1943); State v. Malory, 168 La. 742, 123 So. 310 (1929). It is a general principle of judicial interpretation of a state constitution, as well as a specific prohibition of our constitution, that the legislature may not irrevocably alienate, surrender or abridge the right to exercise the police power. La.Const. 1974, Art. VI, § 9; Fireside Mut. Life Ins. Co. v. Martin, 223 La. 583, 66 So.2d 511 (1953); Baton Rouge Waterworks Co. v. Louisiana Public Service Commission, 156 La. 539, 100 So. 710 (1924); Fernandez v. Alford, supra; Home Bldg. & Loan Assn. v. Blaisdell, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413, (1934). The legislature may delegate, either expressly or implicitly, the exercise of the police power to subordinate boards, commissions or political corporations. Baton Rouge Waterworks, Co. v. Louisiana Public Service Commission, supra; Fernandez v. Alford, supra; Town of Ponchatoula v. Bates, 173 La. 824, 138 So. 851, 853 (1931). Such power, however, belongs to the state; the police power may be exercised by agencies of the state only under a delegation of authority. The state retains the right to recall, abrogate or modify the delegation. Fernandez v. Alford, supra; City of Shreveport v. Kansas City Southern R. Co. 193 La. 277, 190 So. 404, 407 (1939); State ex rel. Porterie v. Walmsley, 183 La. 139, 162 So. 826, 837 (1935); State v. City of New Orleans, 151 La. 24, 91 So. 533 (1922). Consequently, the legislature's prior delegation of police power to its creature or agency, the Orleans Levee District, authorizing it to levy taxes and to acquire land by expropriation, purchase or donation to build a spillway and maintain it for flood protection purposes cannot prevent the state from recalling, abridging or modifying this delegation of power. Moreover, there is no constitutional limitation which prevented the Legislature from exercising its plenary and police *290 powers to discontinue the spillway and to dispose of the property.
The authorities relied upon by the levee commissioners and Howard, Weil for the proposition that the Legislature's divestiture of property from the state agency is an unconstitutional taking are inapposite. On the other hand, their attempts to distinguish the precepts governing this case are without merit.
The City of New Orleans v. State, 443 So.2d 562 (La.1983) did not involve a legislative transfer of property from a creature or agency of the state to private citizens. Instead the case raised the question of whether the legislature could reconstitute the membership of an agency of a home rule charter city that managed a park owned by the city. This court held the legislative act unconstitutional as an unwarranted state interference with the internal affairs of a home rule charter city and as an uncompensated state taking of the city's property. There is language in the opinion which, if taken out of context, might be construed to mean that public property in general is protected from uncompensated taking. Such a construction is unwarranted, however, because it is unnecessary to the holding of the case and in conflict with the authorities and sources of law discussed hereinwhich were not considered in the New Orleans case. Therefore, the language cannot be taken out of context and applied to a situation in which the state exercises its police power in dealing with its own creature or agency and with property which to all practical intents and purposes is the property of the state. Unlike levee districts, home rule charter entities are regarded as more than creatures of the legislature; their powers and functions are by direct grant of the constitution and their discretion of deployment is constitutionally preserved against undue interference. Moreover, the framers, in giving constitutional status to home rule charters, regarded the principles developed by the courts of accommodating individual rights with the state's exercise of its police power as analogously applicable to the resolution of conflicts between police measures and the constitutionally protected rights of home rule governments. Francis v. Morial, 455 So.2d 1168 (La.1984) and authorities cited therein.
State through Department of Highways v. Ouachita Parish School Board, 242 La. 682, 138 So.2d 109 (1961) is not apposite because it did not address the question of whether a state agency may demand compensation when the legislature divests it of property held for a public purpose. In the judicial expropriation instituted against it by the highway department, the school board contended that its property, already devoted to a public use, was not subject to a taking by an agency of the state. The court distinguished between a taking by the legislature itself and a taking by one of its creatures or agencies. The court concluded that as to property already devoted to a public use, when the sovereign on its own behalf seeks to acquire such property by emminent domain, the fact that the land sought to be taken is public property generally is immaterial. On the other hand, when the sovereign has delegated the power of expropriation to one of its subdivisions or agencies, the rule is the agency or department cannot expropriate property already devoted to a public use unless the legislature has authorized it to acquire public property either expressly or by necessary implication. Id., 138 So.2d at 112. The court held that the legislature, by enacting La.R.S. 48:303, had expressly given the highway department authority to expropriate public property for the purpose that it sought the taking. The case did not decide and consequently is not authority as to whether the legislature itself may transfer property from its creature or agency without compensation.
The levee commissioners' contention that Article VI, § 38(A) of the 1974 Constitution accords levee districts a status similar to that of a home rule municipality is without merit. This section merely preserves the boundaries of the various levee districts unless and until the Legislature acts to effect a merger, consolidation, division, *291 or reorganization of existing levee districts. It cannot be read, as the levee board suggests, to insulate the "structure, property and power" from legislative change. Compare La. Const. 1974, Art. VI §§ 4, 6. Furthermore, there is nothing in the proceedings of the convention to indicate the delegates intended to elevate the statutorily defined powers of levee districts relative to ownership of property to a constitutionally protected level.[1] XIX Records, October 3, 1973, at 74-101; October 4, 1973, at 2-32; XXXVIII Records January 14, 1974, at 27; XXXIX Records January 18, 1974, at 187, 188-189, 198.
4. Act 233 of 1984 does not unconstitutionally impair the obligation of contracts.
Intervenor, Howard, Weil, contends that Act 233 of 1984 violates the contract clauses of both the United States and Louisiana Constitutions because it impairs the obligations of the Levee District bonds owned by intervenor. The contract clauses of the two constitutions are virtually identical:
"No State shall ... pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts ..." U.S. Const. Art. I, Sec. 10[1].

* * *
"No bill of attainder, ex post facto law, or law impairing the obligation of contracts shall be enacted." La.Const. 1974, Art. I, Sec. 23.
Article I, Sec. 23 of the 1974 Louisiana Constitution was adopted without debate following a brief explanation indicating that its provisions were intended to incorporate the substance of the contract clauses of the United States Constitution and the 1921 Louisiana Constitution. XV Records September 13, 1973, at 3-4. Insofar as this case is concerned, therefore, the federal and state contract clauses are substantially equivalent.
While the Contract Clause was treated as constitutionally significant during the early years of the United States, see, e.g., Fletcher v. Peck, 10 U.S. (6 Cranch) 87, 3 L.Ed. 162 (1810); Trustees of Dartmouth College v. Woodward, 17 U.S. (4 Wheat.) 518, 4 L.Ed. 629 (1819), after the late nineteenth century, constitutional jurisprudence tended to subsume the clause under the due process and takings provisions of the Fifth and Fourteenth Amendments. The Supreme Court, 1976 Term, 91 Harv.L.Rev. 70, 83 (1977). The clause fell into disuse in the late 1930s and was thought to be a dead letter until recent years. Comment, A Process-Oriented Approach to the Contract Clause, 89 Yale L.J. 1623 (1980). In 1977, however, the Supreme Court revived the all-but-moribund contract clause in striking down state legislative efforts to repeal retroactively a statutory bondholder's covenant that precluded the Port Authority of New York and New Jersey from investing its revenues or reserves in railroad mass transit facilities. United States Trust Co. v. New Jersey, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977). See, The Supreme Court, 1976 Term, supra, at 84. The following year, the court overturned a state pension law as imposing unbargained for obligations upon a party to a private contract. Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978). These decisions, signalling a new activism in the Supreme Court's use of the contract clause to protect economic rights, have been criticized as being inconsistent with each other, with prior contract clause jurisprudence, and with the court's customary deference to legislative regulation of economic rights. See Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 251, 98 S.Ct. 2716, 2726, 57 L.Ed.2d 727 (1978) (Brennan, J., *292 dissenting); United States Trust Co. v. New Jersey, 431 U.S. 1, 33, 97 S.Ct. 1505, 1523, 52 L.Ed.2d 92 (1977) (Brennan, J., dissenting); T.R. Hurst, Municipal Bonds and the Contract Clause: Looking Beyond United States Trust Company v. New Jersey, 5 Hastings Constitutional Law Quarterly 25 (1978). Note, A Process-oriented Approach supra; The Supreme Court, 1976 Term, supra; Note, Revival of the Contract Clause: Allied Structural Steel Co. v. Spannaus and United States Trust Co. v. New Jersey, 65 Va.L.Rev. 377 (1979).
Very recently the Supreme Court synthesized and clarified its disparate approaches to contract clause litigation in upholding a Kansas statute imposing price controls on the intrastate gas market as not constituting an unconstitutional impairment of preexisting intrastate natural gas supply contracts. Energy Reserves Group, Inc. v. Kansas Power & Light, 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983). The court unanimously concluded that Energy Reserves Group's contractual rights had not been substantially impaired because its reasonable expectations had not been impaired by the state's retroactive legislation affecting a heavily regulated industry. See 459 U.S. at 420, 103 S.Ct. at 709 (Powell, J., concurring). Six justices concluded that even if ERG's contractual interests were impaired the act furthers significant and legitimate state interests and is a valid exercise of the state's police power. 459 U.S. at 416-419, 103 S.Ct. at 707-708.
In reaching its decision, the Court elaborated on "the appropriate Contract Clause standard." Id., at 411, 103 S.Ct. at 704. Although the language of the Contract Clause is facially absolute, its prohibition must be accommodated to the inherent police power of the State to safeguard the vital interests of its people. Energy Reserves, supra; Home Bldg. & Loan Assn. v. Blaisdell, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934). Under the appropriate Contract Clause standard, the threshold inquiry is whether the state law has, in fact, operated as a substantial impairment of a contractual relationship. Allied Structural Steel Co., supra. The party complaining of unconstitutionality has the burden of demonstrating, first, that the statute alters contractual rights or obligations. National Railroad Passenger Corporation v. Atchison, Topeka and Santa Fe Railway Co., 470 U.S. 451, 105 S.Ct. 1441, 84 L.Ed. 432 (1985); See United States Trust Co., supra. If an impairment is found, the reviewing court next determines whether the impairment is of constitutional dimension. Id. The severity of the impariment is said to increase the level of scrutiny to which the legislation will be subjected. Allied Structural Steel Co., 438 U.S. at 254, 98 S.Ct. at 2727. Total destruction of contractual expectations is not necessary for a finding of substantial impairment. Energy Reserves, supra; United States Trust Co., 431 U.S. at 26-27, 97 S.Ct. at 1519-1520. On the other hand, state regulation that restricts a party to the gains it reasonably expected from the contract does not necessarily constitute a substantive impairment. Id. at 31, 97 S.Ct. at 1522, citing El Paso v. Simmons, 379 U.S. 497, 515, 85 S.Ct. 577, 587, 13 L.Ed.2d 446 (1965).
In determining the extent of impairment, a reviewing court is to consider whether the industry the complaining party has entered has been regulated in the past. Energy Reserves, 459 U.S. at 411, 103 S.Ct. at 704; Allied Structural Steel Co., 438 U.S. at 242, 98 S.Ct. at 2721, citing Veix v. Sixth Ward Bldg. & Loan Assn., 310 U.S. 32, 38, 60 S.Ct. 792, 794, 84 L.Ed. 1061 (1940) ("when he purchased into an enterprise already regulated in the particular to which he now objects, he purchased subject to further legislation upon the same topic"). The Supreme Court long ago observed: "one whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them." Hudson Water Co. v. McCarter, 209 U.S. 349, 357, 28 S.Ct. 529, 531, 52 L.Ed. 828, (1908).
If the state regulation constitutes a substantial impairment, the State, in justification, must have a significant and legitimate *293 public purpose behind the regulation, Energy Reserves, 459 U.S. at 411, 103 S.Ct. at 704; United States Trust Co., 431 U.S. at 22, 97 S.Ct. at 1517, such as the elimination of unforeseen windfall profits, United States Trust Co., 431 U.S. at 31, n. 30, 97 S.Ct. at 1522, n. 30, or the remedying of other broad and general social or economic problems, Energy Reserves, 459 U.S. at 412, 103 S.Ct. at 704; Allied Structural Steel Co., 438 U.S. at 247, 98 S.Ct. at 2723. The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests. Energy Reserves, 459 U.S. at 412, 103 S.Ct. at 705.
Once a legitimate public purpose has been identified, the next inquiry is whether the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption. Energy Reserves, 459 U.S. at 412, 103 S.Ct. at 705; United States Trust Co., 431 U.S. at 22, 97 S.Ct. at 1517. Unless the state itself is a contracting party, as is customary in reviewing economic and social regulation, courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure. Id. When the State is a party to the Contract, complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake. Energy Reserves, 459 U.S. at 413, n. 14, 103 S.Ct. at 705 n. 14; United States Trust Co., 431 U.S. at 26, 97 S.Ct. at 1519.
Further analysis of the Supreme Court's decisions suggests several general principles that aid in the application of the contract clause standard. A central concern of the court has been to protect legitimate contract-based expectations from government interference. See, e.g., Energy Resources Group, 459 U.S. at 416, 103 S.Ct. at 707; Allied Structural Steel, 438 U.S. at 246, 98 S.Ct. at 2723; United States Trust, 431 U.S. at 19, n. 17, 97 S.Ct. at 1516, n. 17; Comment, A Process-oriented Approach, supra, at 1627. However, the principle of harmonizing the constitutional prohibition against impairment of contracts with the necessary residuum of state power has had progressive recognition: Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order. Into all contracts, whether made between states and individuals or between individuals only, there enters the condition, regardless of whether it is carried into express stipulation, that the state may not bargain away or otherwise be prevented from exercising its police power, viz., the exercise of the sovereign right of the government to protect the lives, health, morals, comfort, and general welfare of the people. City of El Paso v. Simmons, 379 U.S. 497, 85 S.Ct. 577, 13 L.Ed.2d 446 (1969); Home Building & Loan Assn. v. Blaisdell, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934); Manigault v. Springs, 199 U.S. 473, 26 S.Ct. 127, 50 L.Ed. 274 (1905); Long Island Water Supply Co. v. Brooklyn, 166 U.S. 685, 17 S.Ct. 718, 41 L.Ed. 1165 (1897); Stone v. State of Mississippi, 101 U.S. (11 Otto) 814, 25 L.Ed. 1079 (1879). Consequently, when legislation modifies or abrogates contracts already in effect, the crucial question is whether the legislation is addressed to a legitimate end and the measures taken are reasonable and appropriate to that end. Home Bldg. & Loan Assn. v. Blaisdell, supra; Energy Reserves, supra; and United States Trust, supra. Thus, for example, even when the law addresses a legitimate end, it may not be used to burden a politically defenseless or easy target group with the imposition of costs without fair attention to its interests. Cf. United States v. Carolene Prods. Co., 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 783 n. 4, 82 L.Ed. 1234 (1938); Comment, A Process-oriented Approach, supra, at 1646; The Supreme Court, 1976 Term, supra, at 91-94.
In the present case, the Orleans Levee District in 1973 issued bonds, payable to *294 bearer in the denominations of $5,000 in order to raise $1 million toward the improvement of the New Orleans Lakefront Airport. These bonds were general obligation bonds based on the full faith and credit of the Orleans Levee District.[2] On October 27, 1983 the voters ratified the amendment to Article VII, § 14(B) of the 1974 Louisiana Constitution authorizing the legislature to return property expropriated or purchased under threat thereof to former owners after declaring that its public and necessary purpose had ceased to exist. By Act 233 of 1984 the legislature declared that the public and necessary purpose which would have originally supported expropriation of the Bohemia Spillway property had ceased and ordered the return of the property to its former owners or their successors. This act became effective on June 29, 1984. The Orleans Levee Board commenced this litigation on August 6, 1984, to have Act 233 of 1984 declared unconstitutional, and to enjoin the defendant Department of Natural Resources from implementing, enforcing and adopting rules pursuant to Act 233 to the extent found unconstitutional. Howard, Weil purchased $10,000 of the 1973 general obligation bonds on September 30, 1984 and intervened in these proceedings on November 27, 1984, claiming that Act 233 had impaired its contractual rights.
Initially, we have doubts that Howard, Weil, who purchased the bonds after the passage of Act 233 and with full knowledge thereof, has a cause of action to declare the Legislation unconstitutional as an impairment of the obligation of its contract rights. It is a fundamental principle that laws existing at the time a contract is entered into are incorporated into and form a part of the contract as though expressly written therein. Dantoni v. Board of Levee Commissioners of the Orleans Levee District, 227 La. 575, 80 So.2d 81, 83 (1955); Johnson v. Anderson-Dunham Concrete Co., Inc., 212 La. 276, 31 So.2d 797 (1947); Forgay v. Ferguson, 6 La.Ann. 770 (1851); White v. Crook, 426 So.2d 334 (La.App.2d Cir.1983); West v. State, State Superintendent of Public Education, 324 So.2d 579 (La.App. 1st Cir.1975). However, because opposing counsel do not raise any objection, we will assume that Howard, Weil, as successors to the original purchasers of the bonds, may raise the issue of unconstitutional impairment.
Applying the appropriate Contract Clause standard to the present case, we readily conclude that in the threshold inquiry, Howard, Weil has failed to carry its burden of showing that the state law has, in fact, operated as a substantial impairment of a contractual relationship. The intervenor has failed to show that the statute alters any contractual rights or obligations under the bonds.[3] Thus, this case *295 is plainly distinguishable from United States Trust Co. v. New Jersey, supra, and others for there has been no modification or abrogation of a contract, a remedy or a security device here. See also Northwestern National Life Ins. Co. v. Tahoe Reg. Plan Agency, 632 F.2d 104 (9th Cir.1980). Moreover, there was no showing that the act of the legislature has taken from the bonds the quality of an acceptable investment for a rational investor. See W.B. Worthen Co. v. Kavanaugh, 295 U.S. 56, 55 S.Ct. 555, 79 L.Ed. 1298 (1935). There was no showing of any danger of a default upon the bonds. The value of the bonds has not declined in the market; moreover, the Levee District issued more bonds in the amount of $50 million with the highest bond rating and at a low interest rate following the enactment of Act 233 of 1984 and the commencement of this litigation, although the possible return of the mineral property to former owners and possible curtailment of Levee district operations were disclosed in the prospectus of the bond issue.
Howard, Weil called one of its employees, Owen Jones, who testified that in his opinion the return of the mineral property would probably cause the Levee District bonds to decline in rating and increase in interest rate at some time in the indefinite future. On the other hand, intervenor's witness was forced to admit that the act has had no effect on subsequent bond issues and that it would not render the Levee District unable to meet existing payment obligations. We conclude that no basis for an imminent decline in bond values has been shown.
Our conclusion that the party complaining of unconstitutionality failed to show any substantial impairment of its contractual rights is dispositive and it is therefore unnecessary for us to complete the entire Contract Clause analysis in this case. As a check upon our application of the appropriate standard, however, it may be demonstrated that our decision is in accord with the important principles underlying the Contract Clause.
The reasonable expectations of Howard, Weil and the other holders of 1973 bonds have not been impaired by Act 233 of 1984. Under the terms of the bonds their owners have no lien or mortgage on particular property or dedication of specific revenues. In the absence of an alteration of contract, remedy or security device, or a danger of default, they could not reasonably expect to prevent the state from the exercise of its sovereign powers over its property held for a state purpose by one of its agencies.
The Supreme Court has recognized that a state may legitimately protect a virtually limitless range of interests that conflict with or affect economic rights. See, e.g., Home Bldg. & Loan Assn. v. Blaisdell, supra; Marcus Brown Holding Co. v. Feldman, 256 U.S. 170, 41 S.Ct. 465, 65 L.Ed. 877 (1921) (direct state intervention in private economic relations to protect individuals from financial hardship); East N.Y. Sav. Bank v. Hahn, 326 U.S. 230, 66 S.Ct. 69, 90 L.Ed. 34 (1945). The public purpose requirement is primarily designed to prevent a state from embarking on a policy motivated by a simple desire to escape its financial obligations or to injure others through the repudiation of debts or the destruction of contracts or the denial of means to enforce them. Home Bldg. & Loan Assn., 290 U.S. at 398, 54 S.Ct. at 231; U.S. Trust Co., 431 U.S. at 52, 97 S.Ct. at 1533 (1977) (Brennan, J., dissenting.) Because there are few limits on the legitimacy of public purposes, inquiry into whether the state has adopted truly public ends typically is perfunctory. Note, A Process-oriented Approach, supra, at 1631;
*296 Brest, Palmer v. Thompson: An Approach to the Problem of Unconstitutional Legislative Motive, 1971 Sup.Ct.Rev. 95, 106-07. We conclude that the purpose of Act 233 of 1984, which may be reasonably viewed as either the elimination of unforeseen windfall profits or the restriction of a party to gains it reasonably expected from a transaction, easily falls within the broad range of legitimate ends which the legislature may address.
The evidence in this case and the history of the legislation at issue conclusively show that Howard, Weil is not politically defenseless or an obvious target group which might easily be burdened with costs. Further, there is no evidence that the bondholders will in fact be burdened with the cost of returning the property to former owners. Finally, there is ample indication in the record that fair attention was given to the interests of the bondholders in the legislative process.
5. Act 233 of 1984 is not an action taken under Article VI § 38 impairing the obligation of outstanding bonded indebtedness or of any other contract of the Orleans Levee District.
Contrary to plaintiffs' contentions, Act 233 of 1984 does not constitute either an action taken under the authority of Article VI § 38 of the 1974 Louisiana Constitution, or result in an unconstitutional impairment of a levee board bond or contract.[4] The constitutional prohibition that no action taken under § 38(B) shall impair the obligation of outstanding bonded indebtedness or of any other contract of a levee district, refers only to the consolidation, division, creation, merger or reorganization of existing levee districts under § 38(A)(1) and (2). As the action authorized by Act 233 of 1984 does not create, consolidate, divide, reorganize, or merge a levee district, it is not an enactment taken under Article VI, § 38(A) or (B). Furthermore, even if Act 233 of 1984 had involved such an action, for the reasons stated in Section 4, of this opinion, the Act does not unconstitutionally impair the obligation of outstanding bonded indebtedness of the Orleans levee district. Article VI, § 38(B) merely reiterates the constitutional safeguards supplied by the more general contract clause against the unconstitutional impairment of obligations of contracts. Accordingly, the plaintiffs' argument here is a repetition of the same or similar contentions we examined in the previous section and are rejected for the same reasons.
6. Nothing in the 1974 Louisiana Constitution has been construed or applied in such a manner as to impair the obligation, validity, or security of any bonds or other debt obligations authorized under the Constitution of 1921.
Article XIV, § 25 of the 1974 Louisiana Constitution provides:
Nothing in this constitution shall be construed or applied in such a manner as to impair the obligation, validity, or security of any bonds or other debt obligations authorized under the Constitution of 1921.
Plaintiffs and Intervenor, Howard, Weil, contend as an extension of their impairment of contract argument that the 1983 constitutional amendment and Act 233 of 1984 at issue here impinge upon Article XIV, § 25. The principal function of this section appears to be that of a mandate to *297 the courts to construe the 1974 constitution to avoid impairment of the obligation, validity, or security of any bonds or other debt obligations authorized under the 1921 constitution. No construction of the 1974 constitution has been made which conflicts with this mandate. As we have explained in Section 4 of this opinion, there has been no unconstitutional impairment of any litigant's obligation of contract, remedy or security device because of our construction of the constitutional and statutory provisions relevant to this litigation. Accordingly, as no new argument is made under Article XIV, § 25 which has not been urged in the Contract Clause arguments, the contentions here are rejected for the reasons previously stated.
7. The legislature did not exceed its power to return property expropriated or purchased under threat of expropriation to "the former owner under such terms and conditions as specified by the legislature" by ordering the return of such property to "former owners or successors."
One of the specific constitutional limitations upon the plenary power of the legislature is the prohibition against donations of state property contained in Article VII, § 14(A), which, in pertinent part, provides:
"(A) Prohibited Uses. Except as otherwise provided by this constitution, the funds, credit, property, or things of value of the state or of any political subdivision shall not be loaned, pledged, or donated to or for any person, association, or corporation, public or private. * * *"
In addition to the exceptions to this limitation on the use of the State's property provided for elsewhere in the constitution, there are exceptions contained in Article VII, § 14(B), which as amended in 1983 provides, in pertinent part, as follows:
"(B) Authorized Uses. Nothing in this Section shall prevent ... (4) the return of property, including mineral rights, to a former owner from whom the property had previously been expropriated, or purchased under threat of expropriation, when the legislature by law declares that the public and necessary purpose which originally supported the expropriation has ceased to exist and orders the return of the property to the former owner under such terms and conditions as specified by the legislature."
Acting pursuant to this exception to the general prohibition of Section 14(A) against donating the property of the State to private persons, which is a limitation upon its plenary power, the legislature by Act 233 of 1984 declared that the public purpose for the Bohemia Spillway property had ceased to exist and ordered the Levee commissioners:
... to return the ownership of said property to the owners of their successors from whom the property was acquired by expropriation or by purchase under threat of expropriation....
The plaintiffs contend that the return of property expropriated or acquired under threat thereof is a donation of state property and that the legislature cannot return such property unless it acts within the exception to the limitation on its power. Therefore, the plaintiffs further argue, the act of the legislature is either wholly or partially invalid because it orders a return of property to former "owners or their successors" although the exception to the constitutional limitation only permits a return of property to "the former owner under such terms and conditions as specified by the legislature."
The problem of interpretation arises because the exception to the constitutional limitation added by the 1983 amendment, which became Art. VII, § 14(B)(4), raises several questions as to its proper construction: When the legislature declares that property previously taken or sold to the State under distress is now useless for the public purpose it formerly served, and orders the property to be returned to its former owners, and the former owner dies before the property is actually returned, is the legislature prohibited from returning it to the deceased person's successors or heirs? If the legislature may not order the *298 return of the property to the successors or heirs of a deceased former owner, what kinds of "terms and conditions" to the return of the property does the legislature have the power to specify? When the legislature declares extinct the public purpose supporting the prior expropriation and the property was taken from multiple owners, does the prior death of a former owner of one parcel of the property prevent the return of the entire property taken, or does it merely prevent the return of that parcel? Similarly, when a parcel was taken from multiple owners in indivision, what is the effect of the death of one or more of the former owners in indivision?
As we stated in the opinion of this court on original hearing, the provisions of the amendment are ambiguous because it fails to state what is to be done with property designated for return when the former owner dies. It is not clear whether the state is absolutely required to keep it or whether the legislature is to return it to private ownership under just and equitable terms and conditions that will effectuate the purpose and principle of the constitutional amendment.
In construing a constitutional provision or amendment, a court should ascertain and give effect to the intent of both the framers of the amendment and of the people who adopted it. Blessing v. Levy, 39 So.2d 84 (La.1949) Scott v. Ratcliff, 167 La. 237, 119 So. 33 (1928), and State v. Joseph, 143 La. 428, 78 So. 663 (1918). In carrying out this function, therefore, the court should consider the object sought to be accomplished by the adoption of the provision. Stokes v. Harrison, 238 La. 343, 115 So.2d 373 (1959); Barnett v. Develle, 289 So.2d 129 (La.1974); State ex rel. Fernandez v. Feucht, 182 La. 134, 161 So. 179 (1935) and In Re Bankston, 306 So.2d 863 (La.App. 1st Cir.1974). Accordingly, effect should be given to the purpose indicated by a fair interpretation of the language employed, and the construction which effectuates, rather than that which destroys a plain intent or purpose of the constitutional provision. See Blessing v. Levy, supra; State ex rel. Fernandez v. Feucht, supra; Barnett v. Develle, supra.
The purpose of the amendment at issue in this case is to effect the return of property taken or sold under distress to the state for a public purpose when that purpose has become extinct in order to prevent a windfall to the state or to restrict the state to the gains it could reasonably expect from the acquisition of the property. Accordingly, we conclude that the framers and the people who adopted the amendment did not intend that any parcel or undivided interest of property should be retained by the state once the legislature declares extinct the public purpose for its acquisition and orders it returned to private ownership.[5] Otherwise, the purpose of the amendment would be largely defeated because windfalls and unanticipated gains could not be prevented in the many cases in which the state is unable to return property to a former owner due to his premature death or to a remote date of acquisition. As we pointed out in our original opinion, it is inconceivable that the legislature or the people intended to enact a constitutional amendment which would have the discriminatory effect of excluding from its benefit the majority of heirs and successors whose ancestors failed to survive until the date the property is to be returned, thus preserving *299 the advantages of the amendment only for corporations and families blessed with rare longevity. Accordingly, in order to effectuate rather than to destroy the purpose of the amendment indicated by a fair interpretation of all of its provisions and language, we conclude that the legislature may, within its power to return such property, subject to terms and conditions specified by the lawmakers, transfer the property to the former owner or his successors.

Conclusion
Act 233 of 1984 is not unconstitutional for any of the reasons urged in this litigation. The judgments of the district court declaring Act 233 of 1984 unconstitutional and issuing a preliminary injunction are reversed. The petition for a permanent injunction and the motion for summary judgment declaring the act constitutional are dismissed as moot.
DECLARATION OF UNCONSTITUTIONALITY REVERSED. DISTRICT COURT JUDGMENTS REVERSED.
DIXON, C.J., subscribes to the opinion except for section 7 (the last section), from which I dissent with reasons.
WATSON, J., dissents and assigns reasons.
LEMMON, J., dissents and will assign reasons.
DIXON, Chief Justice (concurring in part and dissenting in part).
I fully subscribe to all of the court's opinion except the last section. I respectfully dissent from section 7 of the opinion. The strong public policy against the donation of public property in Article 7, § 14(A) of the Louisiana Constitution requires the closest scrutiny of Act 233 of 1984. Perhaps the legislators and the people, who wrote and ratified the amendment to Article 7, § 14, actually intended that property be returned to heirs of former owners, but the amendment does not say so. C.C. 13.
Article 7, § 14(B) permits "the return of property ... to a former owner from whom the property had previously been expropriated, or purchased under threat of expropriation." Heirs are not former owners; heirs are not persons from whom the property had previously been expropriated; heirs are not persons from whom the property had previously been purchased under threat of expropriation.
Act 233 of 1984 exceeds the authority given the legislature by Article 7, § 14(B) of the Louisiana Constitution. Only former owners are entitled to the return of property.
WATSON, Justice, dissenting.
I respectfully dissent.
When the legislature passed Act 729 of 1983, amending the Louisiana Constitution of 1974,[1] to provide for the return of land and mineral rights to their former owners, and passed Act 233 of 1984 attempting to return the Bohemia Spillway to both the original owners and their successors, it enacted a massive give away of the state's resources.
I. Act 233 of 1984 is unconstitutional insofar as it:
A. orders the return of property to the heirs of the original owners, thereby exceeding the constitutional authority granted by Art. 7, § 14(B) which limits such return to a "former owner";
B. conflicts with the constitutional command that the legislature enact laws to protect, conserve and replenish the state's natural resources, Art. 9, § 1; and
C. impairs the validity of contracts, Art. 1, § 23.
II. The legislative pronouncement that the public and necessary purpose supporting the original expropriation has ceased to exist is erroneous and subject to judicial review as an abuse of discretion.
I. A. LSA-Const. 1974, Art. 7, § 14(B) permits "the return of property, including *300 mineral rights, to a former owner from whom the property had previously been expropriated, or purchased under threat of expropriation...." Under Aguillard v. Treen, 440 So.2d 704, 707 (La., 1983), this unambiguous language must be respected. Constitutional questions must be decided on the basis of the finished product approved by the voters, rather than the drafters' debates. The Bank of New Orleans and Trust Co. v. Seavey, 383 So.2d 354, 356, n. 7 (La., 1980). The phrase "former owners" is not synonymous with "heirs of former owners".
B. The loss of the spillway and its revenues will have a severe, adverse, long range impact in the areas of hurricane protection and flood control, requiring the raising of other levees to a greater height at a cost of $72 million. In addition, railroad tracks, utilities and port facilities will have to be raised or moved at an almost incalculable cost. This "fuse plug" levee prevents silt from damaging oyster beds below the levee; a side effect of the loss of the Bohemia system will be further encroachment of salt water, causing faster attrition of our fresh water marshes which protect the coastline during storms and help keep the ecological balance. Act 233 is in conflict with Art. 9, § 1, which commands the legislature to enact laws to protect, conserve, and replenish this state's natural resources.[2]
C. Act 233 impairs the validity of the mineral leases and contracts of the Board of Commissioners of the Orleans Levee District, as well as the bonds held by Howard, Weil contrary to the state and federal constitutional prohibitions against impairment of contracts.[3] Series 1973A bonds issued under authority of the 1921 Constitution and held by Howard, Weil are secured, not by the full faith and credit of the state, but by the full faith, credit, and resources of the Orleans Levee District. They are payable first from tax levies and then from other funds of the District. Act 233 deprives the Board of some $4,000,000 annually (about one-fourth of its revenues) without replacing it from other sources. Orleans tax levies, presently limited by the Constitution to 5½ mills, are the highest in the state, and cannot be increased without approval of the district voters, which cannot be lightly assumed. The repeal of a covenant which limits the use of revenues available to pay bonds causes an impairment of contracts because it permits a "diminution of the pledged revenues". United States Trust Co. of New York v. New Jersey, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977). State impairment of obligations is permissible under the contract clause of the United States Constitution only when it is "reasonable and necessary to serve an important public purpose."[4] The admittedly important public purpose in United States Trust Company of increasing mass transit facilities was insufficient to validate a statute impairing obligations.
An impairment of the United States contract clause also impairs Louisiana's contract clause. Louisiana Gas Service Co. v. Louisiana Public Service Commission, 245 La. 1029, 162 So.2d 555 (1964). A statute which destroys or impairs the means or remedy for enforcement of an obligation impairs the obligation itself.[5] The value of a contract cannot be diminished by subsequent legislation.[6] Contractual obligations can yield to a proper exercise of the police power only when the purpose is public and not arbitrary or oppressive. Louisiana Gas Service Co., supra. The state's purpose in divesting the Board of the Bohemia Spillway is neither important *301 nor public; it is an outright gift to private persons.
II. The legislative pronouncement that the Bohemia Spillway no longer serves its original public purpose is arbitrary and capricious. Testimony at trial was that the Bohemia has been used sixteen times during major high water since its opening (more times than the Bonnet Carre' and Morganza combined), was last used for major flooding in 1974, and minor flooding in 1984, and in fact had water standing in it at the time of trial. On an ongoing basis, this "fuse plug" levee serves to prevent silt from ruining oyster beds below. Further, its existence is taken into account in the height and location of other levees protecting the area. A constitutional provision cannot shield an exercise of police power from the scrutiny of the judiciary. State, through Dept. of Highways v. Jeanerette Lumber & Shingle Co., Ltd., 350 So.2d 847 (La.1977). Thus, the legislative error in pronouncing the purpose of this give away to be public is reviewable by this court.
I respectfully dissent.
NOTES
[1] The plaintiffs argue that the failure of a floor amendment which would have expressly authorized the Legislature to abolish levee districts reveals an intention to elevate their status. XIX, Records, Oct. 3, 1973 at 93-96. However, under the 1921 Constitution, the districts were regarded as only creatures and agencies of state government despite the lack of any express grant of constitutional power to the legislature to abolish them. La. Const. 1921, Art. XVI, § 1 et seq. Board of Commissioners of Caddo, supra; Richardson & Bass, supra.
[2] These bonds are part of the $77½ million of outstanding bonds issued by the levee district. Owen Jones, an employee of Howard, Weil, testified that there were three issues of bonds outstanding. The first was a two and a half million dollar general obligation bond payable from all available revenue sources from the Orleans Levee Board and all available assets at its disposal. The second is a twenty-five million dollar issue for the Orleans Levee Board Southshore Harbor Marina Project, which has the revenues from the marina pledged to secure it. Finally, a fifty million dollar issue was made in the last quarter of 1984 that is payable exclusively from a special limited tax assessed in Orleans Parish.
[3] The Legislature, in its enactment of Act 233 of 1984, assured compliance with the contracts clause by making the return of the lands within the Bohemia Spillway to the former owners subject to all the servitudes, rights-of-way, surface and mineral leases, and other valid contracts executed by or with the Orleans Levee Board prior to June 29, 1984, the effective date of the Act.

Section 5 of Act 233 of 1984 provides as follows:
Section 5. The return of property by the board to the owners or their successors shall be subject to all servitudes and rights-of-way, whether acquired by expropriation or otherwise, or surface or mineral leases, or other valid contracts executed by or with the board prior to the effective date of this Act. Any deed whereby any property is returned shall state such property is subject to such rights. Any party to a contract in effect on the effective date of this Act with the board concerning property affected by this Act shall be entitled to make payments and give all notices required or permitted under such contract to the secretary until the title to the property affected has been transferred. When such contracts provide for renegotiation of rent between any person and the board, or provide that any person may seek approval by the board, such person shall be entitled to renegotiate such rent or to seek and obtain such approval from the secretary until the title to the property affected has been transferred. Any sum deposited with the secretary pursuant to this Act which represents rent, royalty or other sum attributable to land being returned, shall be paid by the secretary to the appropriate persons.
[4] Section 38. (A) Retention; Reorganization; Consolidation. Levee districts as organized and constituted on January 1, 1974 shall continue to exist, except that

(1) The legislature may provide by law for the consolidation, division, or reorganization of existing levee districts or may create new levee districts. However, the members of the board of commissioners of a district heretofore or hereafter created shall be appointed or elected from among residents of the district, as provided by law.
(2) A levee district whose flood control responsibilities are limited to and which is situated entirely within one parish may be consolidated and merged into such parish under the terms and conditions and in the manner provided in Section 16 of this Article.
(B) Obligation of Contract Affirmed. No action taken under this Section shall impair the obligation of outstanding bonded indebtedness or of any other contract of a levee district.
[5] This opinion does not address the arguments by counsel questioning the wisdom of the electorate in adopting the amendment to Article VII, § 14(B) and of the legislature in declaring the Bohemia Spillway property no longer publicly useful and ordering the return of the property to its former owners. Under the fundamental principles of separation of powers, this court's duty is to interpret and apply the constitution and the laws and not to question the wisdom of the statute or constitutional amendment, or to question the wisdom of the Legislature or the people in adopting them. Sibley v. Board of Supervisors of Louisiana State University, 462 So.2d 149 (La. 1985); State v. Robinson, 223 La. 595, 66 So.2d 515 (1953); Harding Realty Co. v. Blanchard, 179 La. 430, 154 So. 47 (1934); North Central Utilities, Inc. v. Sarver, 366 So.2d 968 (La.App.3d Cir.1978); Porter v. Lombardino, 303 So.2d 493 (La.App.2d Cir.1974).
[1] Art. 7, § 14(B), approved October 22, 1983, effective November 23, 1983.
[2] Louisiana has fact pleadings; it is not necessary to plead legal theories. Thus, this question is properly before the court under the facts pleaded.
[3] LSA-Const. 1974, Art. 1, § 23; U.S. Const., Art. I, § 10, clause 1.
[4] United States Trust Company, supra.
[5] Hibernia Mortgage Co., Inc. v. Greco, 191 La. 658, 186 So. 60 (1938).
[6] Dantoni v. Board of Levee Commissioners of the Orleans Levee District, 227 La. 575, 80 So.2d 81 (1955).