Dear Mr. Bailey:
You requested an Attorney General's opinion regarding the adjustment of millage rates due to a decrease in taxable assessment. You indicate that Ouachita Parish has three properties which were placed on the exempt tax roli, thereby removing a large amount of taxable assessed value in one year. Moving these properties to the exempt tax roll will create a significant loss in tax dollars to local taxing bodies. You question whether a millage rate adjustment can be made because of the value loss in real estate from the previous year.
Article VII, Section 23 of the Louisiana Constitution governs the adjustment of millages. Section 23(A) governs adjustment after the first reappraisal after the effective date of the Constitution. Section 23(B) governs subsequent adjustments and provides as follows:
 (B) Except as otherwise permitted in this Section, the total amount of ad valorem taxes collected by any taxing authority in the year in which the reappraisal and valuation provisions of Section 18, Paragraph (F) of this Article are implemented shall not be increased or decreased because of a reappraisal or valuation or increases or decreases in the homestead exemption above or below the total amount of ad valorem taxes collected by that taxing authority in the year preceding implementation of the reappraisal and valuation. To accomplish this result, the provisions of millage adjustments relative to implementation of Section 18 and Section 20 of this Article, as set forth in Paragraph (A) of this Section shall be mandatory. Thereafter, following implementation of each subsequent reappraisal and valuation required by Paragraph (F) of Section 18 of this Article, the millages as fixed in each such implementation shall remain in effect unless changed as permitted by Paragraph (C) of this Section.
Section 23(B) is only applicable to changes in assessed value due to reassessment. The purpose of Section 23(B) is to ensure that the total amount of ad valorem taxes collected by a taxing authority doesn't increase or decrease due to a change in appraised values or increases or decreases in the homestead exemption. This section doesn't apply to the situation you described, in which there is a value loss in real estate due to the transfer of property to the exempt tax roll.
However, millages may be increased pursuant to Section 23(C) regardless of a value loss in real estate. Article VII, Section23(C) of the Louisiana Constitution provides as follows:
 Nothing herein shall prohibit a taxing authority from collecting, in the year in which Sections 18 and 20 of this Article are implemented or in any subsequent year, a larger dollar amount of ad valorem taxes by (1) levying additional or increased millages as provided by law or (2) placing additional property on the tax rolls. Increases in the millage rate in excess of the rates established as provided by Paragraph (B) above but not in excess of the prior year's maximum authorized millage rate may be levied by two-thirds vote of the total membership of a taxing authority without further voter approval but only after a public hearing held in accordance with the open meetings law; however, in addition to any other requirements of the open meetings law, public notice of the time, place, and subject matter of such hearing shall be published on two separate days no less than thirty days before the public hearing. Such public notice shall be published in the official journal of the taxing authority, and another newspaper with a larger circulation within the taxing authority than the official journal of the taxing authority, if there is one. (Emphasis added).
It has long been the opinion of this office that a taxing authority may increase its ad valorem tax to a rate "not in excess of the prior year's maximum authorized millage rate" after the last re-assessment year, but prior to the next reassessment year. Attorney General Opinion No. 83-659. In Attorney General Opinion Nos. 00-245, 00-245(A) and 82-758, this office determined that the phrase "but not in excess of the prior year's maximum" should be interpreted as referring to the year prior to the last reassessment and not the year prior to which the taxing authority opts to increase its maximum authorized millage. See also, Attorney General Opinion Nos. 01-0400, 01-295, 93-339, and 86-249. Of course, in order to "roll forward" its millage, the taxing authority must follow the requirements of a public hearing after the publication of notice, as set forth in Article VII, Section 23(C).
Trusting this adequately responds to your request, we remain,
Yours very truly,
 CHARLES C. FOTI, JR. ATTORNEY GENERAL
 BY: ____________________________ KENNETH L. ROCHE, III Assistant Attorney General
 June 11, 1986 OPINION NUMBER 86-249
Honorable Gregory W. Belfour 127 — Taxation — Reassessment
City Attorney
City of Lake Charles La. Const. Art. VII. § 23(C). La. R.S.
P.O. Box 1178 47:1705
Lake Charles, Louisiana 70602-1178
 Lake Charles City Council may legally
 return to millage rates levied in 1981
 by a two-thirds vote of the total
 membership of the council, since the
 1981 level was the "prior year's
 maximum authorized millage rate." To
 return to pre-1978 millage rate would
 require a vote of the electorate.

Dear Mr. Belfour:
This is to acknowledge and respond to your request for an opinion of this office concerning rolled-back millage rates in 1982 pursuant to La. Const. Art. VII, Section 23 and La. R.S.47:1705.
In your opinion request, you stated that several tax recipient authorities had their millage rates rolled back in 1982 as follows: a special recreation tax from 2.80 mills in 1981 to 2.08 mills; a fire department minimum salary guarantee from 2.10 mills in 1981 to 1.56 mills; and, a police department platoon system from .93 mills in 1981 to .69 mills. Additionally, you have indicated that on April 3, 1982, voters of the City of Lake Charles approved a tax of 2.10 mills for the fire department's minimum salary guarantee and 2.80 mills for the maintenance of playgrounds and recreation centers.
Your request seeks an opinion as to;
 (1) whether the City Council may legally return to the millage rates levied in 1981;
 (2) whether the City Council may legally return to millage rates authorized in the April 3, 1982, special election; and
 (3) whether the City Council may levy millage rates authorized prior to the 1978 roll-back.
Article VII, Section 23(C) of the 1974 Constitution, as amended, provides:
 Nothing shall prohibit a taxing authority from collecting, in the year in which Sections 18 and 20 of this Article are implemented or in any subsequent year, a larger dollar amount of ad valorem taxes by (1) levying additional or increased millages as provided by law or (2) placing additional property on the tax rolls. Increases in the millage rate in excess of the rates established as provided by paragraph (B) above but not in excess of the prior year's maximum authorized millage rate may be levied by two-thirds vote of the total membership of a taxing authority without further voter approval but only after a public hearing held in accordance with the open meetings law.
Pursuant to the above constitutional provision, the City may legally return to millage rates levied in 1981. In Attorney General's Opinion No. 79-213, this office opined that the Town of Pearl River's general alimony tax, having been rolled back from 7 mills to 5.65 mills, could not exceed the latter millage rate without a vote of the people. Section 23 of the Constitution was amended, and now provides for an increase in the millage rate ". . . not in excess of the prior years's maximum authorized millage rate . . ." In Attorney General's Opinion Nos. 82-83 and 82-758, this office interpreted this phrase to mean the year prior to reassessment.
Since reassessement occurred in 1982, the City may return to 1981 millage rates by a two-thirds vote of the total membership of the City Council. The procedure to be followed by the City Council is set forth in La. R.S. 47:1705 (B).
As to the legality of returning to the millage rate authorized by the April 3, 1982, special election, this office addressed a similar request from the City of Shreveport in Opinion No. 82-83.
The issue raised was:
 If new special purpose millages are approved by the voters in 1982, to be effective for the year 1983, are they subject to the tax millage adjustment required by Article 7, Section 23 . . . after the 1982 reassessment by the Parish Tax Assessor?
As was the situation in Shreveport, Subsection (C) of Art. VII, Section 23 is controlling. This provision authorizes the City Council, by a vote of the electorate, to levy additional or increased millages. Notwithstanding the fact that millages for the minimum salary guarantee for the fire department and the maintenance of playgrounds and recreation centers were rolled back after reassessment, the authorized millages for the tax recipient bodies would be those rates approved by the voters on April 3, 1982.
Turning now to the retroactive application of Art. VII, Section 23, as relates to millage rates authorized prior to the 1978 roll-back, this office is of the opinion such can be done. You will note that Subsection (C) of Art. VII, Section 23 places no limitation on the amount of additional or increased millages. La. R.S. 47:1705, however, would not be available to the City as a vehicle to increase millages to a level prior to 1978.
Section 1705 is applicable to millage increases in excess of the rate established by reassessment, but not in excess of the previous year's maximum authorized millage rate. To return to pre-1978 millage rates, the City Council is required by statute to seek the approval of the electorate.
It is hoped the foregoing adequately addresses the questions you have raised. Should you be in need of further assistance, please feel free to call on us.
Very truly yours,
 WILLIAM J. GUSTE, JR. Attorney General
 BY: ___________________________ CLEVELAND R. COON Staff Attorney
 May 13, 1993 OPINION NUMBER 93-339 Mr. Grover C. Austin Assistant Legislative Auditor Office of Legislative Auditor Post Office Box 94397 Baton Rouge, LA 70804-9397
Dear Mr. Austin:
You have requested an opinion of the Attorney General relative to the applicability of Article VII, Section 23 of the 1974 Louisiana Constitution and LSA-R.S. 33:9005 and 47:1925.4 to the Atchafalaya Basin Levee District (District). Your questions may be restated as follows:
 1. What effect, if any, does Article VII, Section 23 have on the maximum authorized millage that can be levied by the District?
 2. What effect, if any, do LSA-R.S. 33:9005 and 47:1925.4 have on the maximum authorized millage that can be levied by the District?
The taxing authority for levee districts is found in ArticleVI, Section 39(A) of the 1974 Louisiana Constitution. It provides, in pertinent part, the following:
 "For the purpose of constructing and maintaining levees, levee drainage, flood protection, hurricane flood protection, and for all other purposes incidental thereto, the governing authority of a levy district may levy annually a tax not to exceed five mills . . . on the dollar of the assessed valuation of all taxable property situated within the alluvial portions of the district subject to overflow."
Paragraph (B) of Section 39 authorizes levy districts to raise additional funds through an increase in taxes, but only if approved by a majority of the electors.
The Constitution also contains provisions calling for the uniform reassessment of all properties in this state subject to ad valorem taxation to be completed prior to the end of the third year after the effective date of the Constitution. Article VII, Sections 18, 20, and 23 all relate to this vast undertaking.
Prior to its amendment in 1980, Section 23 provided, in pertinent part, the following:
 "Section 23. Prior to the end of the third year after the effective date of this constitution, the assessors and the Louisiana Tax Commission or its successor shall complete determination of the fair market value or the use value of all property subject to taxation within each parish for use in implementing this Article. Except as provided in this Paragraph, the total amount of ad valorem taxes collected by any taxing authority in the year in which Sections 18 and 20 of this Article are implemented shall not be increased or decreased, because of their provisions, above or below ad valorem taxes collected by that taxing authority in the year preceding implementation. To accomplish this result, it shall be mandatory for each affected taxing authority, in the year in which Sections 18 and 20 of this Article are implemented, to adjust millages upwards or downwards without regard to millage limitations contained in this constitution, and the maximum authorized millages shall be increased or decreased, without further voter approval, in proportion to the amount of the adjustment upward or downward. Thereafter, such millages shall remain in effect unless changed as permitted by this constitution." (Emphasis added.)
As can be seen from the above, taxing authorities (e.g., levee districts) were required to adjust millages upwards or downwards without regard to the millage limitations contained in the Constitution (e.g., Article VI, Section 39), thereby increasing or decreasing maximum authorized millages without voter approval. The clear intent of Section 23 was to prevent tax windfalls and/or shortfalls as a result of the implementation of the reassessment and homestead exemption provisions. To carry out this mandated millage adjustment, the Legislature enacted Act 617
of the 1977 Regular Session.
Section 1 of Act 617 required each assessor to furnish each tax recipient body with a statement showing the assessed value of all taxable property appearing on the 1977 tax roll after the reevaluation and reassessment process had been completed.
Section 2 required each tax recipient body, including multi-parish taxing districts (e.g., the District), to utilize this assessment information in computing the amount of millage required to be levied on the adjusted 1977 roll so as to produce approximately the same revenue as was produced from the pre-adjusted 1977 tax roll. This millage was then to be levied on the 1978 roll. In the case of multi-parish taxing districts, the millage to be levied was required to be uniform throughout the district, and to be determined on the basis of total assessments within said district.
Section 7 directed the Legislative Auditor to review these adjusted millages and to order changes in the amount of said millages if he determined an error or errors were made.
The rules of constitutional construction and interpretation pertinent to this issue may be summarized as follows:
Constitutional provisions are to be construed and interpreted by the same rules as are other laws. City of New Orleans v.Scramuzza, 507 So.2d 215 (La. 1987); Firefighters' RetirementSystem v. Landrieu, 572 So.2d 1175 (La.App. 1st Cir. 1990). Writ Denied.
A constitutional provision dealing specifically with a given situation generally prevails over a constitutional pronouncement with only general application. State Department of Highways v.Macaluso, et al., 106 So.2d 455, 235 La. 1019 (1958); and Drewv. Parker, 249 So.2d 356 (La.App. 1st Cir. 1971), Rehearing Denied.
In construing constitutional provisions or amendments, one should ascertain and give effect to the intent of both framers of the amendment and of the people who adopted it and should therefore consider objects sought to be accomplished by the adoption of the provision. Board of Commissioners of OrleansLevee District v. Department of Natural Resources, 496 So.2d 281
(La. 1986).
Proceedings in the constitutional convention which drafted the constitutional provision in question are valuable aids and should be given some weight in determining the purpose, intent, and consequent meaning of those provisions. New Orleans FirefightersAssociation, et al. v. Civil Service Commission of City of NewOrleans, 422 So.2d 402 (La. 1982), Rehearing Denied.
Prior to the 1980 amendment to Section 23, this office consistently opined that the adjusted millage mandated by Section 23 became the new maximum authorized millage that could be levied by a taxing body without a vote of the people. See Attorney General Opinion Nos. 78-1060-A, 78-1090, 78-1289, 79-298, 79-213, 79-260, and 80-414.
A review of excerpts from the Constitutional Convention of 1974, Verbatim Transcripts, relating to Article VII, Section 23, culminating in its adoption with amendments, including the amendment offered by then Governor Buddy Roemer, evidences support for our interpretation:
"MR. CONROY
 The purpose of this section is to insure that the changes which are in assessment practices and procedures . . . will not increase or reduce the amount of taxes collected by local governing authorities . . . so that the total amount of taxes will remain the same . . . so that nobody will suffer and nobody will gain any unexpected advantage out of the change in taxing procedures which the convention has adopted." (74th day's proceedings at page 2007)
"MR. CONROY
 No, as far as this basic concept, it is not a flexible concept insofar as the millage adjustment is designed not to create any additional revenues. In that respect, the concept is not a flexible concept. It is rather a strict concept." (74th day's proceedings at page 2008)
"MR. DeBLIEUX
 The whole purpose of this amendment is to assure that if you have a readjustment in your tax structure, that you're not going to collect more money than you would collect otherwise without that adjustment." (74th day's proceedings at page 2011)
"MR. CHEHARDY
 . . . here's how I read it. If the maximum millage is twenty mills in a district, all you're adding or saying is that in the event that twenty mills yields. . . . if ten mills. . . . are used of the twenty allowed, yields a million dollars. After the first year in which we implement the constitution and have reappraisal, we have two million dollars. Therefore, we cut the millage to five mills. Therefore, the maximum millage will, at that moment, automatically become ten mills because ten is to five as twenty is to ten, and that becomes the new ratio. I see nothing wrong with it. I think we can pass it with impunity. I know from the taxpaying standpoint, I see no harm at all.
MR. ROEMER
 Well, as one mathematician to another, I salute you." (76th day's proceedings at page 2060)
"MR. SHANNON
 Say a taxing authority is authorized, presently, to tax up to five mills. They are presently taxing one mill. What will happen to them under your proposal.
MR. ROEMER
 It depends on what happens under reappraisal. Reappraisal happens first. Let's take the two things that can happen. Let's say that under reppraisal, they have to increase their millage to get the same dollar revenue. That increase goes from one mill to two mills. O.K.? In that situation, the maximum allowable would go up in the same proportion. In other words, one to five would be the same as to two — to whatever number. O.K.? On the other hand, they could go down in the millage if their base increased. The maximum would go down, also.
 What I'm trying to do, V.C., is make sure the people aren't double taxed without them being able to vote on it." (Emphasis added.) (76th day's proceedings at page 2061)
"MR. ROEMER
 Joe, for the information of the other delegates, what have we done up to this point in Revenue, Finance and Taxation that's going to affect these . . . this four and seven and five mill limits. I'm talking about in terms of the rollback and the rollforward. Do you want to explain that to us?
MR. TOOMY
 Well, Buddy the provisions that you referred to says that the taxing authorities shall increase or decrease the millages without regard to millage limitations contained in this constitution, which would be this four and seven mills. I would say that it's necessary to include these sections as we have them here, until the provisions of your sections take effect. We have to maintain the present authorizations, after which time it would be a moot question: the four and seven mills. It would simply maintain the absolute amount of revenues, not necessarily the four and seven mills.
MR. ROEMER
 Well, yes, right. But don't you think it's important to retain the four mills and the seven mills and the five mills because that's the yardstick by which we will measure the rollforward and the rollback? "(Emphasis added.) (79th day's proceedings at page 2152)
Albeit, a great deal of confusion existed during the course of the constitutional debates regarding the impact of the millage adjustment provisions, we believe this confusion was resolved in the minds of most delegates with the passage of the Roemer admendment. The amendment was overwhelmingly supported as evidenced by the 95-12 vote for adoption.
As can be seen from the above, the driving force behind the adoption of the Roemer amendment was to establish a new maximum millage rate based on the concept of parity — a rate that could not be increased except by a vote of the electorate. The prior Attorney General opinions cited hereinabove supporting this interpretation are reaffirmed. We focus now on the 1980 amendment to Article VII, Section 23.
Act No. 1 of the 1980 Second Extraordinary Session, effective December 8, 1980, divided the prior subject matter of Section 23 into Subsections (A), (C), and (D). Subsection (A) is entitled "First Adjustment." The act also added the language contained in Subsection (B) and the last sentence of Subsection (C), relating to subsequent years' adjustments and millage increases to prior years maximums, respectively. They provide as follows:
 "(B) Subsequent Adjustments. Except as otherwise permitted in this Section, the total amount of ad valorem taxes collected by any taxing authority in the year in which the reappraisal and valuation provisions of Section 18, Paragraph (F) of this Article are implemented shall not be increased or decreased because of a reappraisal or valuation or increases or decreases in the homestead exemption above or below the total amount of ad valorem taxes collected by that taxing authority in the year preceding implementation of the reappraisal and valuation. To accomplish this result, the provisions of millage adjustments relative to implementation of Section 18 and Section 20 of this Article, as set forth in Paragraph (A) of this Section shall be mandatory. Thereafter, following implementation of each subsequent reappraisal and valuation required by Paragraph (F) of Section 18 of this Article, the millages as fixed in each such implementation shall remain in effect unless changed as permitted by Paragraph (C) of this Section.
 (C) Increases Permitted. . . . Increases in the millage rate in excess of the rates established as provided by Paragraph (B) above but not in excess of the prior year's maximum authorized millage rate may be levied by two-thirds vote of the total membership of a taxing authority without further voter approval but only after a public hearing held in accordance with the open meetings law." (Emphasis added.)
Article VII, Section 18(F) mandates reappraisals at intervals of not more than four years.
The statutory procedure for taxing bodies to increase their millage rates after subsequent reappraisals was enacted by amendment to LSA-R.S. 47:1705 in 1981. The amendment added Subsections (B) and (D) which provide.
 "B. Increases in the millage rate in excess of the rates established as provided by Paragraph (B) of Section 23 of Article VII of the Constitution of Louisiana, but not in excess of the prior year's maximum authorized millage rate may be levied by two-thirds vote of the total membership of a taxing authority without further voter approval but only after a public hearing held in accordance with the open meetings law. In order to accomplish this result, it shall be mandatory:
 (1) that each tax recipient body shall adopt an ordinance or resolution which shall set forth and designate the adjusted millage rate as required by Paragraph B of Section 23 of Article VII of the Constitution of Louisiana, and
 (2) that each tax recipient body shall adopt another separate ordinance or resolution which shall provide for such millage rate increases by two-thirds vote and shall set forth and designate not only the increased millage rate but also the adjusted millage rate as required in Paragraph (1) above and by Paragraph B of Section 23 of Article VII of the Constitution of Louisiana.
* * *
 D. In order to carry out the mandate of Paragraph B of Section 23 of Article VII of the Constitution of Louisiana, the legislative auditor is hereby authorized and required to review the millages levied by each tax recipient body in each year that reassessment occurs to determine whether the millages levied are in compliance with the provisions of this Section and the constitution. The legislative auditor is also authorized and required to review the millages levied by each tax recipient body in each year in which an increase in millage is made by a two-thirds vote of the total membership of the taxing authority under the provisions of Paragraph C of Section 23 of Article VII of the Constitution of Louisiana, to determine whether the millage levied is in compliance with the provisions of this Section and the Constitution of Louisiana." (Emphasis added.)
As can be seen from the above language, the 1980 amendment applies to millage increases in excess of millage rates established as provided in Paragraph (B) of Article VII, Section 23. Paragraph (B) clearly addresses Subsequent Adjustments,
i.e., adjustments occurring after the initial or "First Adjustment" called for in Paragraph (A). This interpretation is consistent with the language contained in LSA-R.S. 47:1705 which also refers to millage rates established "as provided by Paragraph (B),"i.e., adjustments subsequent to the initial 1978 appraisal and adjustment.
Assuming, arguendo, Section 23, as amended, is ambiguous, the interpretation of those charged with its administration or enforcement over a long period of time is accorded great weight.State ex rel. Singelmann v. Morrison, 57 So.2d 238 (La.App. Orl. Cir. 1952), Writ Denied.
I have been advised by Ms. Paulette Jackson, Tax Review Manager for the Office of the Legislative Auditor, who is responsible for the review of millages called for by LSA-R.S. 47:1705(D), that she and her predecessors have historically interpreted Section 23(C) as being applicable to adjustments of millages established subsequent to the 1978 initial adjustment.
For example, if a levy district was levying the full five mills in 1977, its new maximum authorized millage will be increased or decreased depending on whether the initial reassessment resulted in a decrease or increase, repsectively, in property values. If the district was levying only two of the five mills in 1977 and, as a result of reassessment, the district needed to levy only one mill to generate the same amount of tax revenues, the new maximum authorized millage would be 2.5 mills. Conversely, if the district was levying two mills in 1977 and, as a result of reassessment, it needed four mills to generate the same amount of tax revenues, the new maximum authorized millage would be ten mills. In all three case scenarios, the adjusted millage becomes the new maximum subject to increase only by a vote of the people or the operation of subsequent reassessments.
If, as a result of the 1982 reassessment, property values increased, the district's millage must be proportionately reduced. However, it may revert to the previous year's maximum authorized rate (i.e., that rate established in 1978) by following the procedures set forth in LSA-R.S. 47:1705(B).
If, however, the 1982 reassessment resulted in a decrease in property values, the district's millage must be proportionately increased. In the event the increase results in a rate that exceeds the rate established in 1978, it then becomes the new "prior year's maximum authorized millage" for purposes of future reassessments.
It should be noted that under Article VII, Section 23(C) and Section 1705(B), the district could have returned to the 1978 adjusted rate regardless of whether it was levying all or just a portion thereof for years 1978 through 1981. This is so because the statute and constitution authorize increases not in excess of the "prior year's authorized millage rate" and not the rate actually being levied in the prior year, which may be less than that "authorized".
This office has previously considered the application of Article VII, Section 23(C), and has consistently held that the millage increase afforded therein applies to subsequent (i.e., post 1978) reappraisals and adjustments. Attorney General Opinion No. 81-514-A makes the following observation:
 "The two-thirds vote requirement and the public hearing make reference to the latest amendment to Article VII, Section 23 of the Constitution effected by Act No. 1 of the Second Extraordinary Session of 1980. However, this language is applicable to adjustments of millages subsequent to the 1978 initial adjustment as mandated by the Constitution.
(Emphasis added.)
See also, Attorney General Opinion Nos. 81-396, 81-804, 82-165, 82-758, 83-410, 83-659, and 86-249, all of which reach the same conclusion. We believe this result is clearly supported by the constitutional and statutory provisions, and the interpretative rules discussed herein.
In summary, it is the opinion of this office that the adjusted millage rate established under Article VII, Section 23(A), as a result of the 1978 initial (i.e., first) adjustment/reassessment became the new maximum authorized millage, notwithstanding the rate set by Article VI, Section 39(A). It is our further opinion that the 1980 amendment to Article VII, Section 23 authorizing increases in the millage rate by two-thirds vote of the total membership of the taxing authority applies only to subsequent (i.e., post 1978) adjustments. The term "prior years maximum authorized millage rate," as used in Article VII, Section 23(C), refers to the 1978 initial adjusted rate (i.e., the new maximum) and any increases thereto resulting from a vote of the electorate or subsequent reassessments reflecting a decrease in assessed values.
We turn now to your second question regarding the effect LSA-R.S. 33:9005 and 47:1925.4 have on the maximum authorized millage that can be levied by the District.
LSA-R.S. 33:9001, et seq., (Act 689 of 1976) provides for the creation of parish law enforcement districts for the purpose of financing the sheriffs' offices. Section 9003 directs each district to levy a tax on the assessed valuation of all property appearing on the 1977 and subsequent tax rolls, without a vote of the people, in an amount that would produce for the district in the initial year the same revenue as that estimated to be produced by the sheriff's commission on ad valorem taxes for fiscal year 1976-1977. Thus, the sheriff's office would generate its own tax revenues in lieu of receiving a commission deducted from tax collections made on behalf of other taxing authorities.
Section 9005 provides:
 "§ 9005. Mandatory rollback of ad valorem taxes by tax recipient bodies of the parish
 The total amount of ad valorem taxes received by other taxing authorities in the parish shall not be increased because of the provisions of Sections 9001 through 9008. To accomplish this result, it shall be mandatory for each affected taxing authority in the year in which the special district provided for herein is created to adjust millages so that taxes are not increased as a result of the creation of the special district provided herein. Thereafter such millages shall remain in effect unless changed or increased in a manner provided by law. In the event a taxing authority increases the taxes authorized under this Section without a public referendum, such taxing authority shall have deducted from its share of state revenue sharing funds an amount equal to such taxes increased without a public referendum plus a penalty of fifteen percent of such amount. Provided however, that nothing herein shall prohibit a taxing authority from collecting, in the year in which the special district is created or in any subsequent year a larger dollar amount of ad valorem taxes by:
 (a) levying additional or increased millages as provided by law;
(b) putting additional property on the tax rolls; or
 (c) increases in the fair market or use value of the property." (Emphasis added.)
Section 9005.2 further requires multi-parish taxing districts to adjust millages so that the adjusted millage is uniform throughout the district.
LSA-R.S. 47:1925.1, et seq. (Act 223 of 1984), provides for the creation of assessment districts as a method of financing the assessors' offices. Like the sheriffs, the assessors would generate their own tax monies, in lieu of pro rata revenue deductions from the tax roll.
Section 1925.4 provides:
 "§ 1925.4. Mandatory rollback of ad valorem taxes by tax recipient bodies
 A. The total amount of ad valorem taxes received by other taxing authorities in the district shall not be increased because of the provisions of this Part. To accomplish this result, it shall be mandatory for each affected taxing authority in the year following the year in which the special district provided for herein is implemented to adjust millages so that the taxes are not increased as a result of the implementation of the special district provided for herein; each taxing district whose jurisdiction encompasses more than one parish shall adjust its millage so that the adjusted millage is uniform throughout the district.
 Thereafter such millages shall remain in effect unless changed or increased in a manner provided by law. In the event a taxing authority increases the taxes authorized under this Part without a public referendum, such taxing authority shall have deducted from its share of state revenue sharing funds an amount equal to such taxes increased without a public referendum plus a penalty of fifteen percent of such amount.
 B. Nothing herein shall prohibit a taxing authority from collecting in the year in which the special district is created or in any subsequent year a larger dollar amount of ad valorem taxes by any of the following:
 (1) Levying additional or increased millages as provided by law.
(2) Putting additional property on the tax rolls.
 (3) Increases in the fair market or use value of the property.
 C. This Section shall not apply to millages required to be levied for the payment of general obligation bonds." (Emphasis added.)
Sections 9005 and 1925.4 mandate the District and other taxing authorities, to adjust millages downward so that additional taxes are not received solely as a result of the creation of law enforcement and assessment districts. The statutes further provide that said millage rates, as adjusted, shall remain in effect unless changed or increased "in a manner provided by law."
The issue presented is whether these two statutory provisions are subject to constitutional challenge.
In resolving this issue, we are guided by basic rules of statutory and constitutional construction long reorganized by our judiciary. In American Waste and Pollution Control Co., et al v.State Department of Environmental Quality 588 So.2d 367
(La. 1991) our Supreme Court summarized these basic principles as follows:
 "Unlike the federal government which has only those powers which are granted to it by the states, the Louisiana Legislature has all powers which have not been denied it by the state constitution. Moore v. Roemer, 567 So.2d 75, 78 (La. 1990); Board of Directors of the Louisiana Recovery District v. All Taxpayers, Property Owners, and Citizens of Louisiana, 529 So.2d 384, 387 (La. 1988); Board of Commissioners v. Dept. of Natural Resources, 496 So.2d 281, 286 (La. 1986). The opponents who are challenging the constitutionality of a statute bear the burden of proving clearly that a particular statute is barred by a provision of the state constitution . . . Board of Directors of the Louisiana Recovery District at 387; State v. Griffin 495 So.2d 1306, 1308 (La. 1986). It is insufficient for the opponents to establish that the statute's constitutionality is questionable; instead, the opponents must clearly and convincingly prove that the Legislature's action is in contravention of a specific provision of the constitution. . . . Ancor v. Belden Concrete Products, Inc., 260 La. 372, 256 So.2d 122, 125 (1971)."
Thus, unlike Congress, our State Legislature has all powers of legislation not specifically denied it by the Louisiana Constitution. In the exercise of its legislative power, the legislature may enact any legislation that the state constitution does not prohibit. See Board of Commissions of Orleans LeveeDistrict v. Dept. of Natural Resources, cited supra.
Consequently, in the case at hand, unless there is a particular constitutional provision which prohibits the Legislature from reducing the maximum authorized millage rate that can be levied by the District, the two statutes in question would not be subject to attack.
As previously discussed, the taxing power of the District is found in Article VI, Section 39. Under Section 39(A), the District is empowered to levy annually a tax not to exceed five mills without a vote of the electorate. Paragraph (B) further authorizes the District to levy additional taxes if approved by a majority of the electors.
As previously opined herein, this five mill ceiling was forever adjusted for the 1978 tax rolls as a result of the implementation of the initial statewide reassessment and the operation of Article VII, Section 23. In establishing this new maximum authorized millage rate, Article VII, Section 23(A) provides, in pertinent part:
 "To accomplish this result, it shall be mandatory for each affected taxing authority, in the year in which Sections 18 and 20 of this Article are implemented, to adjust millages upwards or downwards without regard to millage limitations contained in this constitution, and the maximum authorized millages shall be increased or decreased, without further voter approval, in proportion to the amount of the adjustment upward or downward. Thereafter, such millages shall remain in effect unless changed as permitted by this constitution." (Emphasis added.)
The impact of subsequent reassessments on millage rates is addressed in Article VII, Section 23(B) and (C). They provide, in pertinent part:
 "Thereafter, following implementation of each subsequent reappraisal and valuation required by Paragraph (F) of Section 18 of the Article, the millages as fixed in each such implementation shall remain in effect unless changed as permitted by Paragraph (C) of this Section.
 (C) Increases Permitted. Nothing herein shall prohibit a taxing authority from collecting, in the year in which Sections 18 and 20 of this Article are implemented or in any subsequent year, a larger dollar amount of ad valorem taxes by (1) levying additional or increased millages as provided by law or (2) placing additional property on the tax rolls. Increases in the millage rate in excess of the rates established as provided by Paragraph (B) above but not in excess of the prior year's maximum authorized millage rate may be levied by two-thirds vote of the total membership of a taxing authority without further voter approval but only after a public hearing held in accordance with the open meetings law." (Emphasis added.)
The District is constitutionally created and charged with the awesome responsibility of constructing and maintaining levies for flood and hurricane protection, etc. To discharge these duties, the District has historically been granted the constitutional power to levy a tax without voter approval. Thus, the framers of our constitution, and the people who adopted it, recognized the need for a minimal level of funding which would enjoy protection from the whim of the voters and the legislature. See Constitutional Convention of 1974, Verbatin Transcript, 60th Days Proceedings — October 4, 1973, pages 1598-1604.
While this office has opined that the District's maximum authorized constitutional millage has been permanently adjusted by operation of Article VII, Section 23, we are cognizant of the language in Section 23 that this new maximum ". . . shall remain in effect unless changed as permitted by this constitution." In our opinion, this language evidences the clear intent that constitutional millages may only be changed or adjusted by operation of the constitution, itself, or amendments thereto.
The statutes in question purport to mandate an adjustment (i.e., decrease) in the millages levied by all taxing authorities within the new districts being created, with the exception of those levied for the payment of general obligation bonds. They also provide that these new millages, as adjusted, shall remain in effect unless "changed or increased as provided by law." Thus, they purport to authorize future adjustments merely through statutory amendment, rather than by operation of the Louisiana Constitution. To the extent the statutes mandate changes to millages set or adjusted by the constitution they may be in conflict with Article VI, Section 39 and Article VII, Section 23. Consequently, they may be subject to constitutional challenge. Our courts have held that if a statute is in conflict with the constitution, the statute must fall. See Police Jury of Parishof St. Charles v. St. Charles Waterworks Dist. No. 2243 La. 764, 146 So.2d 800 (1962), Rehearing Denied.
Trusting that this opinion adequately answers your questions, I am
Sincerely,
 RICHARD P. IEYOUB Attorney General
 BY: ______________________ ROBERT E. HARROUN, III Assistant Attorney General
 JAN 03, 2002 OPINION NUMBER 01-0400
 129 TAXATION
 Art. VII, 23(C)
Mr. Elton M. Lagasse
Superintendent A taxing authority which did not increase the
Jefferson Parish Public School system millage rate in the re-assessment year, could set
5091 Manhattan Boulevard the ad valorem millage at the level prior to
Harvey, LA 70048-4495 re-assessment "not in excess of the prior year's
 maximum rate."

Dear Superintendent Lagasse:
You requested the opinion of this office regarding whether the School Board of Jefferson Parish (the "School Board"), which did not increase the millage rate in the re-assessment year of 2000, could set the ad valorem millage at the level prior to re-assessment not "in excess of the prior year's maximum rate" in the calendar year 2001.
Article VII, Section 23(C) of the Louisiana Constitution provides as follows:
 Nothing herein shall prohibit a taxing authority from collecting, in the year in which Sections 18 and 20 of this Article are implemented or in any subsequent year, a larger dollar amount of ad valorem taxes by (1) levying additional or increased millages as provided by law or (2) placing additional property on the tax rolls. Increases in the millage rate in excess of the rates established as provided by Paragraph (B) above but not in excess of the prior year's maximum authorized millage rate may be levied by two-thirds vote of the total membership of a taxing authority without further voter approval but only after a public hearing held in accordance with the open meetings law; however, in addition to any other requirements of the open meetings law, public notice of the time, place, and subject matter of such hearing shall be published on two separate days no less than thirty days before the public hearing. Such public notice shall be published in the official journal of the taxing authority, and another newspaper with a larger circulation within the taxing authority than the official journal of the taxing authority, if there is one. (Emphasis added).
It has long been the opinion of this office that a taxing authority may increase its ad valorem tax to a rate "not in excess of the prior year's maximum authorized millage rate" after the last re-assessment year but prior to the next reassessment year. Op.Atty.Gen. No. 83-659. In Ops.Atty.Gen. 82-758, 00-245 and 00-245(A), this office determined that the phrase "but not in excess of the prior year's maximum" should be interpreted as referring to the year prior to the last reassessment and not the year prior to which the taxing authority opts to increase its maximum authorized millage. See also, Ops.Atty.Gen. 93-339, 86-249, 01-295. Of course, in order to "roll forward" its millage, the taxing authority must follow the requirements of a public hearing after the publication of notice as set forth in Article VII, Section 23(C).
Trusting this adequately responds to your request, we remain
Yours very truly,
 RICHARD P. IEYOUB Attorney General
 BY: __________________________ MARTHA S. HESS Assistant Attorney General
RPI/MSH
 AUG 17, 2001 OPINION NUMBER 01-295
Mr. J. Pete Peters 90-A-1 Public Funds and Contracts
Administrator Act VII, Section 23
Louisiana Tax Commission 129 Taxation
P.O. Box 66788
Baton Rouge, LA 70896 If Louisiana Tax Commission deems that reappraisal
 did not occur in 2000 and orders a new appraisal in
 2001, the prior year maximum is 2000, not 1999 for
 purposes of Act VII, Section 23 (C)

Dear Mr. Peters:
You requested the opinion of this office concerning the reassessment of property and the establishment of millage rates required in Article VII, Section 23 of the Louisiana Constitution. You advised that the Louisiana Tax Commission (the "Commission") determined that several parishes did not reassess in 2000 as mandated. Therefore, the Commission ordered a reassessment for the year 2001. The question presented is whether the 1999 millages or the 2000 millages would be the millage rates to be applied after reassessment.
Article VII, Section 23 of the Louisiana Constitution provides in pertinent part as follows:
 "C. Nothing herein shall prohibit a taxing authority from collecting, in the year in which Sections 18 and 23 of this Article are implemented or in any subsequent year, a larger dollar amount of ad valorem taxes by (1) levying additional or increased millages as provided by law or (2) placing additional property on the tax rolls. Increases in the millage rate in excess of the rates established as provided by Paragraph (B) above but not in excess of the prior year's maximum authorized millage rate may be levied by two-thirds approval but only after a public hearing . . ." (Emphasis added)
In Ops.Atty.Gen. 82-758, 00-245 and 00-245(A), this office determined that the above emphasized phrase "but not in excess of the prior year's maximum" should be interpreted as referring to the year prior to the last reassessment and not the year prior to which the taxing authority opts to increase its maximum authorized millage. See also, Ops.Atty.Gen. 93-339, 86-249.
In the factual situation that you described, the Commission, pursuant to the authority found in R.S. 33:9005.1 and 47:1837, deemed that the 2000 reassessment was fatally flawed and "that no reappraisal was completed", so there was no reassessment in 2000. The reassessment is occurring in 2001. In accordance with the opinions of this office dating back to 1982, the "prior year's maximum authorized millage rate" would be the year prior to the reassessment. If there is deemed to be no reassessment in 2000, and the reassessment occurs in 2001, the prior year would be 2000 and not 1999.
Trusting this adequately responds to your request, we remain
 Yours very truly,
 RICHARD P. IEYOUB
 Attorney General
 BY: ___________________________
 MARTHA S. HESS
 Assistant Attorney General